## Wytheville.

HICKMAN'S EX'OR AND AL. V. TROUT AND AL.

JUNE 16th, 1887.

1. FRAUDULENT CONVEYANCES—*Burden of proof.*—Fraud must be clearly proved. Burden of proof rests on the alleger. It may be proved by circumstances. When the evidence shows a *prima facie* case of fraud, the burden shifts to the upholder of the transaction to establish its fairness. The grantee must be proved to have had notice of grantor's fraudulent intent.

2. IDEM—*Indicia of fraud.*—The usual badges of fraud are: Gross inadequacy of price; no security taken for the purchase money; unusual length of credit; bonds taken at long periods; conveyance in payment of alleged antecedent indebtedness of father to son residing together; threats and pendency of suits; concealment of the transaction; keeping the deed unacknowledged and unrecorded for considerable time; grantor remaining in possession as before the conveyance. Any of these facts may make a case of *prima facie* fraud, calling on the parties for explanation.

3. IDEM—*Case at bar.*—Where to these *indicia* are added the absence of itemized accounts, vouchers, &c., contradictions in testimony of grantor and grantee, the want of means in grantee to create the alleged indebtedness of grantor to grantee, and the failure to examine as witnesses persons having opportunities to know the facts; these things combined—

HELD:

To establish the fraudulency of the conveyance as to both grantor and grantee.

Argued at Staunton. Decided at Wytheville.

Appeal from decree of circuit court of Shenandoah county, rendered April 10th, 1885, in the chancery suit wherein John T. Hickman's executor and George A. Hupp

are complainants, and Isaac Trout and James S. Trout are defendants. At the hearing the circuit court dismissed the bill with costs, and the complainants obtained an appeal and *supersedeas*. Opinion states the case.

*Walton & Walton* and *Barton & Boyd,* for the appellants.

*Williams & Bro.* and *H. C. Allen,* for the appellees.

RICHARDSON, J., delivered the opinion of the court.

The object of this suit, brought in April, 1873, was to set aside as fraudulent and void, a deed executed February 5th, 1872, and acknowledged March 7th, 1873, by the grantor, the said Isaac Trout, and recorded March 28th, 1873, and purporting to convey to the said James S. Trout all the grantor's real estate for the professed consideration of $3,000, whereof $500 is recited to have been paid in hand, $500 evidenced by bond payable on demand, and the residue evidenced by four bonds, each for $500, payable in four, six, eight, and nine years, respectively, with interest from their dates; and also to enforce upon the said real estate the liens of two judgments against the said Isaac Trout, obtained and docketed in said county in 1873, after the recordation of said deed; the first being in favor of the said Hickman for $2,455.34, with interest from May 8th, 1871, and $10.45 costs, and the second in favor of said Hupp for $750, with interest from January 1st, 1861, and $7.95 costs, subject to certain credits.

The bill alleged that said conveyance was made with intent to hinder, delay, and defraud the complainants and other creditors of the grantor, and that the grantee was privy to such intent; and the bill alleged divers circumstances as evidence of the fraud charged. Each of the

defendants answered separately, denying the alleged fraud-
ulent intent, and insisting that the conveyance was made
for valuable consideration and in good . faith. By both
sides depositions were taken constituting a voluminous
record. A recital of the evidence would be impracticable
and useless. However, as the result of a careful examina-
tion of the whole mass, we are satisfied that the following
pregnant facts are well established and are decisive of the
case.

On its face, the deed purports to be executed by Isaac
Trout and wife, though he alone signed it; which may
indicate that, in the inception of the transaction, a convey-
ance was in contemplation, free from the incumbrance of
dower. The usual lien for the deferred payments is not
reserved; and no other security is taken therefor. The
estate conveyed consists of a tract of sixty-three and one-
half acres, a lot of five acres, and a house and lot in the
town of Woodstock. The clear preponderance of evidence
is that this real estate in the aggregate was, at the time of
its conveyance, worth, free from incumbrance, $5,500. As
much as this, Isaac Trout, the grantor, had been offered;
and he demanded even more. The grantor was seventy-
two years old, and his wife only a few years younger. The
grantor and grantee were father and son; the latter being
a widower without children, thirty-six years old, engaged
in running a village newspaper in Woodstock; and since
1866, boarded himself and one and sometimes more of his
apprentices at his father's house. He was possessed of
limited means, apparently inadequate to pay for the real
estate conveyed to him.

Isaac Trout was, at the time of this conveyance, and had
long been, indebted beyond his means of paying, and was
much harrassed with duns and threatened with suits by
his creditors, and only kept them off by promising, from
time to time, to sell his property and pay his debts; and

these circumstances were known to his son and grantee. One witness (Dr. Irwin) testified that he had made Isaac Trout, the grantor, a standing offer of $4,000 for the sixty-three and a half acres alone from 1866 till the fall of 1872.

The deed in question, made February 5th, 1872, was only acknowledged the seventh of March, 1873, and then before Justice Graybill, a near relative of the parties, who was told, as he testifies, "in a careless sort of way," "to keep the matter private." No apparent change in the possession of the property took place after the execution of the deed. Witnesses depose that after its execution the grantee attended to this property as still being his father's, and as late as the fall of 1872 spoke of his father's unwillingness to trade any part of the sixty-three and a half acre tract for part of the witness' land, but said he desired to sell one hundred fine trees off it. Isaac Trout, being old and in feeble health, did not attend to his outdoor business, and his son, the said James S. Trout, attended to the farm and had the fences and the house in town repaired.

In March, 1873, the complainants placed their claims in the hand of attorneys, who instituted actions thereon. On the twenty-fifth of March, 1873, the counsel for the Trouts informed those attorneys, by letter, that Isaac Trout had sold his real estate to his son, and that if pressed, the matter must be settled by law. On the twenty-eighth of March, 1873, the deed was recorded. "By direction," a lawyer named McKay had written several deeds for the separate pieces of property. But, "under the advice of a lawyer," James S. Trout deposed that he (James), in order to avoid the stamp tax, wrote the deed in question incorporating the several deeds in one. Neither of these lawyers deposed in the case. James S. Trout himself had studied the law and had practiced awhile.

On the important question of the payment of the alleged consideration of $3,000, the answer of Isaac Trout sets out

that at the time of his sale of his real estate to his son he owed his said son a considerable sum of money, and he files with his answer a statement thereof, which is as follows:

| | |
|---|---:|
| Amount of taxes paid by J. S. Trout for I. Trout from 1868 to 1872, - - - - | $126 81 |
| Amount paid for hire of hands, - - - | 345 00 |
| Amount paid by him to J. P. Nelson, - - | 60 00 |
| Amount paid on store account for clothing for Mr. and Mrs. Isaac Trout, and money drawn from the Herald office, from 1866 to 1871, | 425 00 |
| April, 1871.—Amount paid Williams & Bro. on judgment of Mary McIntruff, - - | 222 17 |
| April 29, 1871.—Amount paid on claim of Clower & H., - - - - - - | 20 83 |
| Amount paid for supplies, pork, beef, flour, etc., for 1871–2, - - - - - | 450 00 |
| July 3, 1874.—Amount paid on Copperfield grant, | 46 38 |
| July 3, 1874.—Amount paid Walton & Walton on judgment of George Halen, - - - | 190 00 |
| July 13, 1874.—Amount paid on same, - - | 58 17 |
| Amount paid Hottel & Painter on old mill acc't, | 100 00 |
| | $2,044 36 |

It will be observed that of this sum of $2,044.36 no itemized accounts are filed, and no memorandum of any settlement, and no credits are allowed for board of grantee and his apprentices. In his deposition, which was taken November 30th, 1874, James S. Trout, in answer to questions on cross-examination, deposes:

Qu. 38. "How much did your father owe you at the time of signing the deed? Give the amounts and items and dates, and produce all the evidences of such indebted-

ness as you may have in your possession or under your control."

Ans. "Money advanced for taxes, $126.81; the tax bills are herewith produced, No. 1 to No. 9, (they are not in the record), represent the amount paid before signing the deed, and the $126.81 the whole amount paid for taxes before and since; amount paid for hire of hands from 1866, $345, but a small part of this paid since; this is by account kept both by father and myself. Amount of note paid J. P. Nelson—I don't think I have this note. Amount of money drawn from Herald office, and clothing settled for at stores for Mr. and Mrs. Isaac Trout from 1866 to 1871, $425. These accounts are at Campbell, Danner & Ott's, J. W. Danner's, Danner & Bro.'s, S. A. Danner's, Heller & Bro.'s, Heller & Coffman's, Fravel & Lacey's, &c., Cobb & McCann's, E. L. Cobb's, and B. Smith's, and moneys evidenced by Herald office. Amount paid Williams & Bro. on McIntruff judgment, $222.17, April, 1871. See the judgment marked satisfied. Amount paid Clower & Hockman, $20.83, April 29th, 1871, evidenced by books of Williams & Bro."

Qu. 39. "Have you no vouchers for the payment of moneys from the Herald office, and for accounts of merchants showing the payment of the same to or on account of Isaac Trout?"

Ans. "These merchants' accounts were charged to me in my general account, and moneys furnished from the Herald office, both by myself and my different partners, without vouchers, further than charging to me on the Herald books."

Qu. 40. "Do the entries either upon the mercantile books or the Herald books show other than charges against you?"

Ans. "I think they sometimes specify for whom."

Qu. 41. "Can you tell the number of times they specify for whom, and the amounts, if any are so specified in either of the said two kinds of accounts?"

Ans. I cannot tell how many, for it was generally understood that I supplied everything, both money and necessaries generally for the family, for my father, and the general running account was kept against me individually."

Qu. 42. "Will you produce your book in which you kept your entries of account between yourself and father for examination?"

Ans. "The only accounts kept between us, as in regular form, was the one kept by my father for moneys for hire of his hands, and the commencement of the account for supplies, which was found too inconvenient to keep by him and discontinued. The statement of account between us was taken from the Herald books and merchants' accounts rendered from time to time, and the receipts for moneys paid on judgments."

Qu. 43. "When was the statement of account to which you referred in your examination in chief made up, and from what sources?"

Ans. "It was made up a short time before the purchase of the land; I don't know how long; that part of it paid before 1872. I made up my statement of that portion of the account due me prior to the purchase from a settlement between my father and myself some time prior to my purchase, and that portion of the account due after the purchase from the receipts and judgments and a statement of account kept from the time of the purchase."

And in answer to question 45, he said: "I had other dealings with my father; I was boarding with him and had one apprentice-boy generally with me; and furnished most of the supplies for a short time, and all since 1866," &c.

Qu. 48. "You have spoken of a settlement having been made between yourself and your father some time prior to the sale of the land to you, what items entered in that settlement, and what was the result of it?"

Ans. "The items specified in answer 38. The result was a balance due me on two first payments, that is, of $500 cash in hand and $500 on demand, I think; according to my recollection it amounted to $1,100 and something. I forget the amount."

Qu. 49. "Then you paid no money down at the execution of the deed?"

Ans. "The money was paid down before."

Qu. 50. "How long before the date of the deed did the settlement take place?"

Ans. "But a short time; I disremember exactly."

Notwithstanding the facts thus brought out on his cross-examination, this grantee-witness, in his answer to the bill, which was sworn to twenty-fourth February, 1874, states that "the cash payment of $500 was *bona fide,* and he has paid off the first bond of $500, payable on demand in full; and on a fair settlement and adjustment of accounts between himself and the said Isaac Trout, there will, he believes, be a large balance in this defendant's favor to be credited on the bonds not yet due, and that at the time of the purchase of said real estate by this defendant, it was understood and agreed between him and said Isaac Trout he should have such credit."

Yet in his deposition Isaac Trout, on cross-examination, deposes:

Qu. 87. "How many bonds were executed?"

Ans. "Six."

Qu. 88. "A bond was then executed for the dower payment?"

Ans. "Yes. We had made no settlement."

Qu. 91. "How long did you hold the six bonds before you and James had a settlement?"

Ans. "I think a month or so; that is, the two first bonds."

Now observe: The statement of account which makes

James S. Trout, the grantee, the creditor of Isaac Trout, the grantor, in the sum of $2,044.36, was sworn to by Isaac Trout before J. H. Graybill, J. P., on the first of December, 1874, and, as stated and sworn to, was filed with and as part of the answer of said Isaac Trout as above stated. That account, as we have shown, is not itemized. Does James S. Trout, in his aforesaid answer to question 38, or in any other way, explain it with the least degree of satisfaction? Taking it that the items are stated in the order in which the transactions occurred, it clearly appears therefrom that only a comparatively small portion of it is subsequent to the date of the deed. Or, to state it differently, the first item, any part of which can, from the account as stated, be claimed to be after the date of the deed, which is February 5th, 1872, is the sum in gross of $450 for supplies in "1871–2." How much of this charge was for supplies furnished after February 5th, 1872, the date of the deed, is in no way explained by anything in the record. But concede for the sake of the argument that half of it, or $225, was subsequently furnished, and add to that sum the remaining four charges in the account, to-wit: $46.33, $190, $58.17, and $100, which, with the $225, would make $619.50, which, subtracted from $2,044.36, would leave due Jas. S. Trout at the date of his alleged purchase the sum of $1,424.81. Why, then, did James S. Trout, according to his statement, make a cash payment of $500, and execute five bonds for $500 each for the deferred payments, when, if his statement be true, he only owed his father of the purchase price of $3,000 the sum of $1,575.19; or, taking the statement of Isaac Trout as true, why were "six bonds," covering the whole alleged purchase price, executed?

Again: At the trial of an action between James S. Trout and J. S. Erwin, which involved the question of the ownership of this land, or of some timber cut therefrom, Judge

Bird was one of the witnesses.   Judge Bird was also examined as a witness in this case, and deposed that at one of the trials "James S. Trout testified that he had paid the whole cash payment, $500, in money; that he counted it out to his father, and had executed his bonds for the deferred instalments;" and that at the same trial Isaac Trout testified that "his son, James, had paid him only about $300 in money and that the balance of the $500 he had paid in provisions furnished the family."

Dr. Irwin testified in this case that "James S. Trout said that he had made a down payment of $500 in cash and executed bonds for the deferred instalments," and that "Isaac Trout said in his evidence that James had paid him only $300 or $325 in money or cash, and had been supplying the family with provisions."   It is impossible to reconcile these variant and wholly inconsistent statements with each other, or to make any honest deductions therefrom, the base-rock upon which to erect a superstructure clothed with the characteristics of common honesty and fair dealing.   The record discloses many other and important instances of inconsistencies and of contradiction between the sworn statements of the grantor and grantee equally repulsive to all our ideas of good faith and fair dealing.

The record also contains evidence that money obtained by James S. Trout from the sale of timber and crops from this land before his purchase was used to effect the alleged payments claimed by James S. Trout to have been made by him for his purchase.   But the record contains no evidence of itemized accounts, books of accounts, or receipts for money paid by James S. for Isaac Trout.   Nor is there any attempt to separate and distinguish those items, which, by James S. Trout's statement in his aforesaid answer to question 38, were made *before*, from those which were made *after*, his alleged purchase.   By that account as set forth in that statement, and attempted to be proved, as we

have seen, the grantee claims not only to have paid the down payment of $500, which in the deed is recited as having been "paid cash in hand," and the $500 which is recited therein as being evidenced by bond payable on de-mand, but also to have arranged the payment of two of the bonds of $500 each, payable in four and six years, respectively, after the date of the deed, or two-thirds of the purchase money. This much he could not have owed according to the aforesaid facts drawn out on his cross-examination. But, for the sake of the argument, grant it; what then became of the two remaining bonds due with interest in eight and nine years, respectively, after their date? Are they left for the complainants whose debts have been standing so long unpaid? Not so. On the con-trary, Isaac Trout claims that, by endorsement made on said two bonds on the fourteenth of February, 1872, he assigned them both—one to Henry Trout, his brother, and the other to William D. Trout, his nephew—in part pay-ment of debts he owed them; though as late as twenty-first April, 1875, when his deposition was taken, he still retained these two bonds, and, for aught appearing in the record, he yet retains them, and Henry and William Trout are ignorant of the alleged assignment.

Again, there is no evidence to show that the grantee pos-sessed the means to create the debt claimed to be due him from his father, the grantor. He sold his share of the newspaper in April, 1871. He was then in debt and needed money, and endeavored to sell the bonds given him for his said interest at a discount. But none of this money is traced to the alleged land purchase in question. He had previously bought all his father's personal property, valued at $150, which personal effects remained in unchanged possession. The grantee with one, and sometimes more, of his apprentices boarded from 1866 to 1872 with the grantor. This board, in the nature of things, must have

been quite equal to the alleged indebtedness from grantor to grantee; yet, while charges for that period for money advanced for the payment of the grantor's taxes and debts, and for supplies generally are clumped together, without itemization, against the grantor, there is no reckoning as to the grantor's board account against the grantee. In the family of the grantor during this period lived the widowed sister of the grantee; but neither she, nor any of his apprentices, nor the storekeepers from whom he professes to have purchased the supplies for the grantor, nor the lawyers to whom he claimed to have paid money for him, were examined as witnesses; but without proper vouchers, receipts, itemized accounts, and books of entry, the grantee undertakes, with such help as he could obtain from his aged father, the grantor, whose vague recollection is apparent from the inconsistencies in his statements, to establish the fact that he, in good faith, paid and was entitled to credit for the $2,044.36 as set forth in the statement filed with the answer of his co-defendant, the grantor, Isaac Trout, which statement was not sworn to until December 1st, 1874.

Not until the tenth of April, 1885, did this cause come on for final hearing. Then both plaintiffs and defendants, by their counsel, having in open court waived an issue, and the issue being thus dispensed with, the circuit court decreed that the complainants' bill be dismissed, with costs to the defendants. From that decree the complainants obtained an appeal and *supersedeas*.

After careful consideration of the facts established by the proof contained in the record, we are unable to come to any conclusion other than that the deed whereby Isaac Trout conveyed his real estate to his son, James S. Trout, for the pretended consideration of $3,000 was made with the intent to hinder, delay and defraud the appellants and other creditors of Isaac Trout. We have arrived at this con-

clusion only after a painstaking investigation, keeping in view that the presumption is always in favor of innocence, and that the courts should be far from leaning to the conclusion of fraud, and keeping also in view the principle that fraud must be distinctly alleged and clearly proved as alleged. The facts constituting the fraud must be clealy and conclusively proved. And the burden of proof is on him who alleges the fraud.

It is not, however, necessary, in order to ascertain fraud, that direct, affirmative, or positive proof of fraud shall be produced. Concerning the actions of men, and especially when prompted by the secret, unexpressed, hidden motives of the actors, demonstration certainly is not attainable, nor is it required. As is the case with respect to knowledge on other matters, fraud may be inferred from facts that are established. It is enough if facts be established from which it would be impossible for the mind fairly and reasonably to conclude anything other than that there must have been fraud in the transaction.

"A deduction of fraud," says Chancellor Kent (2 Kent's Com. 484), "may be made not only from deceptive assertions and false representations, which may be trivial in themselves, but may in a given case be often decisive of a fraudulent design."

While the proof of fraud rests on the alleger, yet the burden may be shifted from the party impeaching the transaction to the party upholding it; as where the evidence shows a *prima facie* case of fraud, the burden of showing that the transaction was fair lies upon him who seeks to uphold it. And if from the relations of the parties, and the surrounding circumstances, a doubt is thrown around the payment in good faith of the consideration for the conveyance of property, the grantee must prove the payment of the consideration, or the existence and *bona fides* of the debts, if the conveyance was made to pay

debts due to the grantee. But to vitiate a conveyance on the ground that it was made with intent to defraud the grantor's creditors, the grantee must have had notice of the grantor's intent. *Garland* v. *Rives*, 4 Rand. 282.

These principles are quite familiar and well settled and need no labored citation of authorities. See Kerr on F. & M., 196 *et seq.;* Bump. on F. C., 36; *Johnson* v. *Wagner*, 76 Va. 589; *Knight* v. *Copits*, 23 W. Va. 639; *Martin & Gilbert* v. *Rexroad*, 15 W. Va. 512; *Herring* v. *Wickham*, 29 Gratt. 632.

Certain circumstances are often referred to as *indicia* of fraud, because they are usually found in cases where fraud exists. Even a single one of them may be sufficient to stamp the transaction as fraudulent. When several are found in the same transaction, strong and clear evidence will be required of the upholder of the transaction to repel the conclusion of fraudulent intent. In the case here, as has been shown in summing up the facts established by the evidence, quite a number of the usual badges of fraud are found grouped together and left unexplained. These are: gross inadequacy of price; no security taken for the purchase money; unusual length of credit for the deferred instalments; bonds taken payable at long periods when the pretence is that the deferred instalments evidenced by them had already been satisfied in the main by antecedent debts due by the obligee to the obligor; the conveyance made in payment of alleged indebtedness of father to son residing together as members of one family; the indebtedness and insolvency of the grantor, and well known to the grantee; the threats and pendency of suits; the secrecy and concealment of the transaction; keeping the deed unacknowledged and unrecorded for over a year; grantor remaining in possession as before the conveyance, and cautioning the kinsman justice, who took the acknowledgment, to keep the matter private, and the relation between

grantor and grantee. Surely, these facts make so strong a *prima facie* case of fraud as to put on the grantee, not only in behalf of common fairness, but in self-vindication, the burden of repelling the conclusion to which they irresistibly lead, that of fraudulent design by the grantor, fully known to and participated in by the grantee. Such, we say, is the irresistible influence from the facts established; and to repel such inference there was need of the most indisputable proof of the good faith of the transaction, and of the *bona fide* existence of the debts in satisfaction of which the conveyance was, for over two-thirds of the alleged consideration, claimed to have been executed. Such rebutting evidence, however, the parties seeking to uphold the deed, utterly failed to produce. The absence of itemized accounts, vouchers, &c., the inconsistencies and contradictions in the testimony of the grantor and the grantee, the want of means in the grantee to create the alleged indebtedness of the grantor to him, and the failure to examine as witnesses other persons who had ample opportunities of knowing the facts, and by whom the transaction might in all probability have been upheld if fair—all these things, however trivial taken separately, yet, taken together, they constitute a chain of circumstances powerfully increasing the impression of fraud, which the contemplation of the *indicia* aforesaid has already been stamped on the mind; and that impression becomes so strong as to lead necessarily to the conclusion of the presence of fraud in the transaction.

Finally, it would really seem to the careful and impartial investigator of the mass of testimony presented by the record that very seldom has there been brought into a court for consideration a case where fraudulent intent in the execution of a conveyance of property has been more clearly established wholly by circumstantial evidence. Therefore, we are of opinion that the circuit court of

Shenandoah erred in decreeing that the complainants' bill be dismissed, with costs to the defendants, and that the said decree should be reversed and annulled, and such decree entered here, declaring said conveyance from Isaac Trout to James S. Trout fraudulent and void as to the appellants and other creditors of said Isaac Trout, as the said circuit court should have entered.

FAUNTLEROY, J., dissenting, said:

I dissent from the opinion of the majority of the court in this case—not only as to the conclusion announced, but as to the facts disclosed by the record. The bill was filed in 1873 by John T. Hickman and George A. Hupp for the purpose and object to have set aside, as fraudulent, voluntary and void, a certain deed conveying all the real estate of Isaac Trout to James S. Trout, and to rescind and set aside the sale of the personalty of said Isaac Trout to the said James S. Trout, and to subject the said estate, real and personal, to the satisfaction of the judgments and executions of the said John T. Hickman and George A. Hupp against the said Isaac Trout. The bill charges fraud in the transaction, and guilty knowledge on the part of the grantee in the deed, James S. Trout, of the intention of the grantor, Isaac Trout, to hinder, delay and defraud his creditors generally, and the complainants particularly, and prays for a discovery from both of the said defendants, and for a jury to try the issue.

The answers of Isaac Trout, grantor, and James S. Trout, grantee, are filed as of November, 1874, and March, 1874, and they deny all fraud, guilty knowledge or intention of fraud, and they make full disclosure responsive to the bill, and assert the *bona fides* of the sale and the execution and full and valuable consideration in the deed.

Depositions are taken, *pro* and *con*, and filed in the

cause. But no step is further taken in the cause after 1875, until in September, 1884, when the death of the complainant, John T. Hickman, is suggested, and the cause is revived in the name of his personal representatives, and continued until April term, 1885, when, upon the submission of the cause to the court, both parties waiving a jury, the decree was entered dismissing the bill.

The facts of the case as disclosed by the record are : That Isaac Trout, an aged and feeble man of seventy-three years, and in ill-health, living in the town of Woodstock, Va., incapacitated for business, and unable to obtain a living for himself and family, consisting of himself, his wife, and a widowed daughter with several children, executed a deed dated February 5th, 1872, acknowledged March 7th, 1873, and admitted to record March 28th, 1873, by which he sold and conveyed to his son, James S. Trout, his real property, consisting of a small lot with a dilapidated house upon it, in the village of Woodstock, a five-acre out lot, and a tract of sixty-three and a half acres of land near to or adjoining the town, for the consideration of $3,000, payable $500 cash, and the residue in instalments of $500 each, evidenced by the bonds of said James S. Trout to the said Isaac Trout for $500 on demand, with interest from date, $500 payable four years after date, $500 payable six years after date, $500 payable eight years after date, and $500 payable nine years after date, each with interest from date, February 5th, 1872.

The said Isaac Trout had previously and by another transaction sold his personalty, consisting of a small and indifferent lot of old household articles, which mostly were within the poor debtor's exemption, for the price of $150, paid by James S. Trout.

The aforesaid deed and sale of personalty the bill charges to have been designed and executed with intent to hinder, delay and defraud the creditors of the said Isaac Trout,

and especially the complainant, Hickman, in the collection
of their just debts; and the petition for appeal assigns
that the circuit court erred in not so decreeing, and in dis-
missing complainants' bill.

The bill charges fraud and collusion of fraud, and gross
inadequacy of consideration in the deed. The answers are
responsive to the bill, and all fraud or guilty knowledge
of fraudulent intent and inadequacy of consideration are
denied, in general and in detail, and the deed and trans-
action being legitimate upon their face, the question for
this court is whether, upon all the evidence in the record,
and fair deductions therefrom, the charges in the bill are
sustained by evidence sufficient to overcome the pre-
sumption of law in favor of honesty and legitimacy?
In the case of *Williams* v. *Lord & Robinson, &c.*, 75 Va.
400, Burks, J., delivering the unanimous opinion of this
court, says: "According to numerous decisions of this court,
there is nothing on the face of this deed that warrants
the inference of fraud. There is no doubt that the pro-
visions of a mortgage or deed of trust may be of such a
character as of themselves to furnish conclusive evidence
of fraudulent intent; but the presumption of law is in
favor of honesty, and the court cannot presume fraud
unless the terms of the instrument preclude any other in-
ference." (Citing *Dance* v. *Seaman*, 11 Gratt. 778; *Brocken-
brough's Ex'or* v. *Brockenbrough's Adm'r*, 31 Gratt. 580–591.)
Mere suspicion of fraud is not sufficient; the circumstances
of the case may consist with honesty of intention (Bump.
F. C. 552, 534–5–6, 2d edition); and the case is one for the
court to say whether, upon all the evidence and the pecu-
liar circumstances and situation of the grantor and the
grantee, any presumption of fraud is raised, and, if any,
whether it be overcome by weightier counter presumption
of fairness.

The grantee, James S. Trout, who was a widower without

children or child, was a printer and owner of a newspaper interest in Woodstock, and as such was engaged in active and profitable business. He lived and boarded with his father from 1866 to 1872, and (from the necessity of the case, arising from his father's age, decrepitude, and utter inability to derive a living from his land, which was worn, wasted, and without fencing or improvements), furnished the supplies for the family, in kind and in money, and in payment of wages to servants and other employees, just as they were needed, from day to day—in many instances the father and other members of the family resorting to the stores in Woodstock for needed articles, which were furnished to them upon the credit and account of James S. Trout, who, in addition to all this, paid from time to time, at the request of Isaac Trout, sundry debts to creditors upon judgments and claims in lawyers' hands for collection against Isaac Trout, and also taxes upon the land. It was expressly agreed that all this was not a gratuity, but to be paid for by Isaac Trout whenever he could succeed in selling his land. This course of things went on for years, Isaac Trout endeavoring to sell his land and pay his debts— first, at the high rates prevailing in 1866, and subsequent years, and failing to do so, even to the complainant, Hickman, his creditor, who refused to buy the land, saying that he would not give $35 per acre for it, as he had better land, better situated, and with improvements on it (a new barn, &c.), which he had offered to sell for $35 per acre, and could not obtain it.

In 1871, Isaac Trout's condition was such, from the failure of his crops for several years and inability to find tenants for his land, without buildings and fencing, and near a town, and wasted and worn and grown up in pine bushes, that he agreed with his son, James S. Trout, to sell his lands to him for the consideration of $3,000, which, though less than he had been asking in former years, when

lands were greatly higher and more in demand, was considered a fair and full price for the property, in the condition in which it was and had been for so many years, and subject to the contingent right of dower of Isaac Trout's wife, who was much younger than he and robust in health, and who refused to unite in the sale or to relinquish her dower. From the nature of things, it was impossible for Isaac Trout and his son, James S. Trout, to ascertain at the time of the sale, except approximately, the amount due to James for all his advancements made for the support of the family in all these years; but, making a rough and partial estimate, they were fully satisfied that the lowest sum which would be found due to James S. Trout, upon full and accurate settlement of accounts between him and his father, would be enough to pay so large a part of the purchase price agreed as to make it unnecessary to require security from him, either personal or a lien retained upon the land; but his bonds were taken for the entire purchase money, until about a month afterwards a partial settlement was had, and an amount due James S. Trout was found to warrant the surrender to him of his first two purchase-money bonds of $500 each, which were given up to him. A few months afterwards another and fuller account was settled between Isaac Trout and James, embracing matters due at the time of sale and advancements made from time to time since, which showed that there was due to him, in both settlements altogether, $2,044.31 from Isaac Trout, whereupon two more of his said purchase money bonds for $500 each were given up to him, making in these two settlements $2,000 paid on the purchase money, all of which save $294.33 was due at the time of sale. The two remaining bonds of James S. Trout for $500 each were assigned, one to Henry Trout for money borrowed from him by Isaac Trout to pay to his creditors, some of which was paid to the complainant, John T.

Hickman, and the other to his nephew, Wm. D. Trout, and Henry Trout, for money advanced. These bonds, when they became due, have not been paid because of the pendency of this suit to set the sale aside; but James S. Trout in his answer states, and the record shows, his ability to pay them.

Among the badges of fraud alleged, and chief among them, is inadequacy of consideration. It is well settled that to avail to set aside a deed, this badge, when standing alone, must be so gross as to be inconsistent with any other than a fraudulent intent in the bargainees; and that, when coupled with other badges, it must still be such as upon all the facts and circumstances developed in the evidence to forbid the belief that the vendor ever agreed to sell for such a price in a *bona fide* sale, or except as a part of a sham sale in fraud of his creditors. Even some inadequacy of price, in the absence of fraudulent intent, is not a sufficient ground to set aside a deed. *Tebbs* v. *Lee*, 76 Va. 744. Inadequacy may be indicative of fraud, but may be rebutted, and must be gross and palpable. *Southerlin* v. *March, Price & Co.*, 75 Va. 229. In this last mentioned case, an insolvent grantor conveyed all his property, and yet the deed was sustained.

The inquiry in the case in hand is, was the price agreed, $3,000, for the land subject to dower, grossly and palpably inadequate, or was it inadequate at all?

The evidence shows, beyond a question, that James S. Trout's claim against his father was *bona fide* and most meritorious withal; and he had a legal and moral right to buy the land, as alleged, to save his claim for advancements theretofore made, and to enable his father to pay his other creditors. The record shows that the complainant, John T. Hickman, tried to do the same thing, declaring when Isaac Trout offered to sell the land to him, that it was not worth, and he would not give, $35 per acre for it;

and then, in 1872, after he had been told by Isaac Trout that it had been sold to James S. Trout, offering Isaac Trout $50 an acre for it to save his debt.

Three other witnesses—Dr. J. S. Irwin, Mark Bird, and C. Lichliter—are introduced to testify to the inadequacy of the purchase price of the land. They all testify to their conjectural estimate of the land, with clear title, *free from dower*. The record shows that Dr. J. S. Irwin was the owner of a saw-mill to which James S. Trout hauled some logs cut from the land he bought from his father. Dr. J. S. Irwin had a debt against Isaac Trout, and he held on to the logs, or lumber cut from them, on the ground that the logs and the land did not belong to James S. Trout, but were the property of Isaac Trout. James S. Trout sued Irwin; and upon the trial Irwin and his counsel, Mark Bird, raised the question and set up the defense of the validity of the sale of the land to James S. Trout by Isaac Trout; and, upon this very issue, upon the verdict of a jury of the vicinage, well acquainted with the value of the land, and all the parties and witnesses, the court rendered judgment against Irwin and for James S. Trout.

Sixty-three and one-half acres of land, at $35 per acre, (which John T. Hickman himself said it was not nearly worth), would be $2,222.50. The house in town was not worth so much as $1,000, with a title free from dower, according to the testimony of J. H. Grabill, and the fact that the Wright property adjoining it, a much larger lot and in every way more valuable and desirable property, had sold for less than that sum.

The witness, V. Neeb, who is a farmer and owner of land adjoining the Trout land, says, that if the tract contains sixty-five acres, it is worth $3,000; and the town lot of five acres is worth $350; but these estimates are free from dower. Neeb and Lichliter would not have bought it at any price subject to dower.

According to these witnesses, Neeb and Grabill, who are the best informed and most disinterested witnesses who testify in the case as to the value of the property, $4,380 was a fair and full price for the entire property free from dower. From this, deduct $1,380, say thirty per cent., for dower, and it leaves $3,000—the price agreed for the land by the sale from Isaac Trout to James S. Trout. Among the badges of fraud alleged, in the petition for appeal, to exist, are the length of time the bonds of the purchaser were given to run; the retention of possession of the prop·erty sold by the grantor; and the delay in the acknowledgment and recording of the deed.

The right to give long credits in the sale of property belongs to the *jus disponendi* of the owner, which the law respects; and the purchase-money bonds all bore interest from date of sale—a fact of import,—the *contrary* case being adverted to in 77 Va. 827. At the time of the sale, February, 1872, there was no expectation of judgments; it was not until March and April, 1873, that the complainants sued after learning of the sale and the conveyance. The delay in the acknowledgment and recording of the deed is shown to have been but a mere neglect from procrastina·tion, for the justice was told of the deed at the time of its execution and requested then, and time and again, to take the acknowledgment months before he did it. The record-ing of the deed was wholly non-essential as between the parties, and so far as the complainants were or could be affected or concerned; their debts were very old ante-war·claims, and one of them a security debt for which Isaac·Trout was bound.

Much stress is laid upon the alleged badge of fraud that·the grantor, Isaac Trout, and his family continued to live·in the dwelling in town after as they did before the sale. It is probable, when he sold to his son, that Isaac Trout—aged, feeble, helpless, and dependent upon the dutiful

affection of his son—believed that in the future, as in the past, they would all live together in the house. But, if his reliance was upon his son's duty and devotion to his old father, mother and widowed sister, and not upon any provision in the agreement of sale, it is not a case of secret trust. The existence of any such provision is expressly negatived by the depositions of the parties, and it is nowhere proved. Circumstances which, as between strangers, might point significantly to fraud and collusion in a sale, are explained by the fact that they naturally and properly obtain between the parties to this transaction, and are reconcilable and consistent with good faith and rectitude in the sale by the undisputed fact in the record that James S. Trout, the purchaser, was a widowed, childless son, who had been for years making his home with his father's family and *providing for the household*, and "honoring his father and mother" as the heads of the family, though they were actually dependent upon his support. Could the sale vary this state of things and transform the admirable duty of this loving son into the serpent-tooth of a *"thankless child"*?

This as to the house in town. As to the out-lot and sixty-three and a half acre tract of land, the son, first as helping his father and then as tenant, had long before the sale full possession, management and control of them; so there could not be the usual, formal, "outward and visible signs" of the change of ownership as to these. Yet the evidence explicitly shows that James S. Trout, after the sale, made repairs to the house in town, paid the taxes, and improved the land with a new plank fence, planted out, manured and carefully nurtured an extensive and thrifty orchard of several hundred fruit trees; cut and hauled and sold the timber from the land; and exercised such conspicuous, open and notorious acts of ownership as to induce and warrant the verdict of a jury that he was

the actual owner and *bona fide* purchaser of the land, in a suit to try that very issue.

There is in the whole record no material circumstance in the case of which it may not be fairly said, "the circumstance may consist with honesty of intention"; and as to the most suspicious, there is such a conflict of evidence that the transaction, so far as affected by them, must stand. Bump. F. C. 562 (584 2d ed.).

A comparison of the facts and peculiar circumstances of this case, with the facts of the cases cited and relied on by appellant, in which fraud was held to be proved, (*Knight* v. *Capito*, 23 W. Va.; 77 Va., 827; 76 Va., 589; 78 Va. 477,) shows such a difference between those cases and this, in many essential particulars, and in their character as a whole, which shows that if *they* were cases of fraud, *this is not.*

The case of *Burton* v. *Mills*, 78 Va. (3 Hansbrough), 477 (referred to and quoted from in the petition), was a deed of trust in which the grantor conveyed all his property of every description, incumbered and unincumbered, without regard to the incumbrances, to a trustee for the benefit and enjoyment of the grantor, his wife and children, with the express stipulation in the deed that the trustee should permit the grantor to retain possession and control of the property conveyed, and to sell and dispose of any or all of it, and providing that if the grantor should survive his wife the trust should cease and all the property subject of the trust should revert unrestrictedly to the grantor. It was in commenting upon this monstrous fraud that Judge Richardson, delivering the opinion of this court, said: "This is a remarkable paper. It, in effect, only secures the grantor's property to his own use and enjoyment. It was made at a time when the property (to say nothing of the claim of Mrs. Mill) was largely incumbered by the trust deed of September 27th, 1869, to secure I. P. Johnson,

no reference to or provision for the payment of which is made, although the use and control of the property conveyed is left absolutely to the will of the grantor. The deed is a sort of conditional declaration of insolvency." Such is not, in the remotest similitude, the case under review. The sale appears, by the record, to be a *bona fide* transaction, and I am of opinion that the decree of the circuit court dismissing the bill is right, and the same should be affirmed.

DECREE REVERSED.