**IN RE: STARLIGHT GROUP, LLC, Debtor.**

**Michael Dorula, Robert A. Meletti and Julie E. Meletti, Movants,**

**v.**

**Kathryn Flanders, Respondent.**

**Case No. 11-18241-RGM**

United States Bankruptcy Court, E.D. Virginia. Alexandria Division

Signed July 17, 2013

Robert M. Marino, Redmon Peyton & Braswell, LLP, Alexandria, VA, for Trustee.

Kevin M. O'Donnell, Henry & O'Donnell, P.C., Alexandria, VA, for Debtor and Debtor Designee.

(Chapter 7)

Contested Matter (Objection to Proof of Claim 2 of Kathryn Flanders)

### MEMORANDUM OPINION

Robert G. Mayer, United States Bankruptcy Judge

The objection to Kathryn Flanders' proof of claim will be sustained because the claim, which was transferred to Ms. Flanders, was originally procured by fraud, a fraud of which Ms. Flanders knew or should have known. The claim is for $20,400. It arose out of a payment to Ms. Flanders' husband from the proceeds of a short sale of real property he owned with two other individuals.

Scott A. Flanders, Brett E. Flanders and Curtis D. Carlson purchased a house at 2 Lovett Drive, Lovettsville, Virginia, as an investment about April 1, 2005. They borrowed about $660,000 from Cardinal Bank which was secured by a first deed of trust on the property. It turned out to be a terrible investment. By early 2010, the property had dropped in value by about half and the three investors were looking for a way out.

Scott Flanders is an attorney who had operated a real estate settlement agency, Northern Virginia Title & Escrow, since 1993. *See In re Scott A. Flanders,* Bankr. E.D.Va. Case No. 10–16528–RGM, Schedule B, Item 14 (50% membership interest in Northern Virginia Title & Escrow, Inc.) and Statement of Financial Affairs, Question 18.[1] He is married to Karen Flanders. Brett Flanders is his brother and Kathryn Flanders is his sister-in-law, Brett's wife. J. Gregory Holmes is a realtor who had known Scott Flanders for more than ten years and had used his title company for closings for years. He considered Flanders a friend, but did not know Brett Flanders or Curtis Carlson. Carlson does not appear to have been in-

---

1. The facts are taken from the hearing held on June 19, 2013, on this objection and the hearing held on June 7, 2013 on the objection of Michael Dorula, Robert A. Meletti and Julie E. Meletti to another proof of claim. Holmes and Brand were the principal witnesses in both hearings. The evidence in the two hearings overlapped and the parties agreed that the evidence presented in the first hearing would be used in the second hearing. The exhibits contained the docket and most of the significant documents filed in Scott Flanders' and Brett Flanders' bankruptcy cases. To the extend portions of other documents filed in their cases are referred to in this opinion, the court takes judicial notice of the papers filed in its clerk's office.

volved in the transaction giving rise to Kathryn Flanders' proof of claim.

Holmes was closely connected to Starlight Group, LLC, the debtor in this case, as its principal real estate agent, a lender, a consultant and the architect of its investment schemes.[2] Starlight originally invested in the rising real estate market by buying properties and selling them when they appreciated. They were not intended to be long-term investments. Holmes found the properties for Starlight to purchase and Spencer Brand who owned Starlight found the private investors to lend Starlight the money to purchase the properties. Like many others, when the real estate bubble burst, Starlight was left holding several—now distressed—properties. Starlight was unable to pay its investors and, except for trying to sell its distressed properties, had stopped operating.

With the dramatic change in the real estate market—plummeting rather than soaring—Holmes saw a new business opportunity. He realized that individuals who owned their homes which were now worth significantly less than what they had borrowed to purchase them were looking for a way out of their difficulties. He realized that the homeowners were willing to sell their homes at a significant loss and for less than the amount due on the mortgage—called a short sale—but wanted a release of liability from their lenders. Holmes testified that national lenders would give a release of liability as part of a short sale, but that local lenders, such as Cardinal Bank, would not.

He developed a second investment scheme. He would locate distressed homeowners, negotiate a short sale and obtain a release of the homeowner's liability to the lender as a part of the transaction. But, there was more. Starlight would purchase the property at the short sale and quickly resell it at a profit. Holmes received a real estate commission on the short sale to Starlight and on the sale from Starlight. He also received a share of the profits of the transaction. He testified that it was 90% of the profit, although Brand testified that it was 50%.[3] He presented this new investment scheme to Brand. Brand agreed and borrowed more money from new investors. In the end, it was also unsuccessful. Starlight filed a chapter 7 petition on November 16, 2011.

While Holmes was engaged in buying properties for Starlight at short sales, he found out about Scott Flanders' situation. It was at the beginning of 2010. Scott Flanders and Holmes agreed that Holmes would negotiate a short sale for the Flanders and Carlson. Holmes testified that Scott Flanders and he knew that while Cardinal Bank would agree to a short sale, it would not release the Flanders and Carlson from liability on the note. Holmes further testified that Scott Flanders was a sophisticated investor knowledgeable in real estate matters and aware of the significance of the deficiency remaining after the short sale.

Cardinal Bank approved the short sale to Starlight for a sales price of $225,000. The sale closed at Scott Flanders' title agency, Northern Virginia Title, on March 31, 2010. The settlement statement showed no proceeds to the three sellers—Scott Flanders, Brett Flanders and Curtis Carlson. Cardinal Bank's deficiency was

---

**2.** *See* Holmes' Proof of Claim 10 where he used "Realtor to Starlight Group, LLC" as his title; Proof of Claim 11 where he used "Lender to Starlight Group, LLC"; and Proof of Claim 12 where he used "Consultant to Starlight Group, LLC."

**3.** Most of the transactions testified to at the trial showed the higher 90/10 split.

about $323,000. On May 6, 2010, also at Northern Virginia Title, Starlight closed on its resale of the property for $319,945. As seller, Starlight received $291,644.93. Its net profit was $65,672.99.[4] While the exact dates are unclear, Holmes listed the property for sale about February 9, 2010, and obtained the contract no later than April 2, 2010.[5]

Brand testified that shortly after the May 6, 2010 closing, Holmes computed the net profit from the deal and gave him instructions on the split of the profits. Holmes, Brand testified, instructed him to pay $20,400 to each of Scott and Brett Flanders, pay Holmes $20,700 and pay Starlight $4,237. The total to be disbursed, $65,737.00, was very close to the net profit of $65,672.99. Brand further testified that he had a conversation with

Scott Flanders shortly after his conversation with Holmes. Flanders told him that he thought he was entitled to more of the proceeds. He also directed that the money Holmes had directed be paid to his brother and him should be paid to Karen and Kathryn Flanders, their wives. Brand told Flanders that he should not do this—referring to paying the money to the wives—but Flanders assured him that everything was proper. Flanders also told Brand that he would likely file bankruptcy.

Brand testified that Kathryn and Karen Flanders left the $20,400 payments in Starlight as loans rather than be paid in May 2010. On June 7, 2010, Brand signed two promissory notes on behalf of Starlight. One was payable to Karen Flanders; the other to Kathryn Flanders. Each was for $20,400. The noteholder

---

**4.** This is the difference between the amount paid by and received by Starlight (which includes closing costs) as shown on the two settlement statements. There were additional expenses that reduce the actual profit not included on the settlement statements, such as interest paid by Starlight to its investors. However, Holmes testified that the interest paid to investors was not computed for each deal. Instead, the interest necessary to pay the investors was taken from the first sales each month. By the end of the month—in this case March 2010—all investor interest had been paid and the proceeds received by Starlight from the closing were split between Holmes and Starlight.

**5.** Exhibit F addresses some of Holmes' marketing efforts for the Lovettsville property. The source of Exhibit F was not discussed at the trial. It appears to be from a website that obtains information from local multiple listing services. It starts with a photograph of the property with the caption "Listing Provided Courtesy of: John Gregory Holmes, Keller Williams Realty. The local MLS requires us to register users." The financial information and the dates contained in it, to the extent testified to by other witnesses or contained in other exhibits, coincide with the other testimony or exhibits. The source of each entry is

noted as either "Public Records" or "Inactive MRIS."

Exhibit F states that the property was purchased on April 1, 2005 for $659,990 according to public records. While not identified in the exhibit, this was the Flanders' and Carlson's purchase. The next entry is February 9, 2010, when the property was listed for sale. The source is given as "Inactive MRIS." On April 2, 2010, a contract was listed as pending, also according to MRIS. This was the contract for Starlight's resale of the property. The Cardinal Bank (continued ...) short sale closed two days later, on March 31, 2010. In addition, it would not have been entered as a pending sale on the MRIS because that would have effectively taken the property off the market. It is not known if the April 2, 2010 date reflects the date of the contract or the date the contract was noted as pending in MRIS. The property was reported sold on April 7, 2010, according to public records. This was the short sale to Starlight. The date reflects the date the deed was recorded. The settlement statement shows March 31, 2010 as the settlement date. On May 6, 2010, and May 11, 2010, the property is reported as sold for $319,945, from MRIS and public records, respectively. This was the sale by Starlight. The settlement statement is dated May 6, 2010.

could demand payment on thirty days notice. Interest was payable monthly at the rate of ten percent per annum. Starlight's ledgers show that both Kathryn and Karen Flanders received monthly interest payments commencing on July 1, 2010, and ending for Kathryn on July 1, 2011 and for Karen on December 2010, when she was paid her principal amount.

Cardinal Bank sued Scott Flanders, Brett Flanders and Curtis Carlson. On July 23, 2010, judgment by default was entered against them for $323,049.94 plus $4,055.50 for attorney's fees. Scott Flanders filed a chapter 7 petition in bankruptcy twelve days later, on August 4, 2010. *In re Scott A. Flanders*, Bankr.E.D.Va. Case No. 10–16528–RGM. He scheduled three unsecured creditors: Cardinal Bank for $325,000; Bank of America for a foreclosure deficiency in an unknown amount; and a condominium association for condominium fees in the amount of "$0.00".[6] He was granted a discharge on November 17, 2010.

On December 1, 2010, Starlight paid Karen Flanders—Scott Flanders' wife— $120,400. The memorandum in Starlight's ledger states "Repayment in full of notes." The ledger reflects two loans were paid, one for $100,000 and the other for $20,400. There are also two entries on December 1, 2010 showing two consulting fees each in the amount of $20,400, one each payable to Karen and Kathryn Flanders. The memorandum for Karen Flanders' fee is "Consulting Fees to K. Flanders on prop 2 Lovett Dr., Lovettsville, VA." The memorandum for Kathryn Flanders is "Consult-

ing Fees to Kathryn Flanders on prop 2 Lovett Dr., Lovettsville, VA." Neither wife had anything to do with the property. Kathryn Flanders' note was never paid and is the basis for her proof of claim which Scott Flanders signed as her attorney.

Brett Flanders filed a chapter 7 petition in bankruptcy on September 23, 2010. *In re Brett E. Flanders*, Bankr.E.D.Va. Case No. 10–18045–RGM. He scheduled only one unsecured creditor, Cardinal Bank, for $325,000.[7] His Statement of Financial Affairs, Question 10 stated that he transferred restricted stock in SAIC valued at $100,000 to his wife, Kathryn Flanders, in December 2009. The trustee settled his avoidance claim for $45,750. Brett Flanders was granted a discharge on January 27, 2011.

Holmes testified that he gave a portion of his profits from the transaction to Scott and Brett Flanders because he felt bad for them. This was the only short sale in which he was unable to obtain a release from the lender.[8] He felt that they had been "railroaded" by Cardinal Bank and he wanted to help them out of the difficult situation. Ms. Flanders, in defense of her proof of claim, also argued that the transfer was a gift. The gift argument, however, is inconsistent with the manner in which Starlight treated the transaction. It issued Forms 1099–MISC, Miscellaneous Income, reporting $20,400 as nonemployee compensation to both Karen and Kathryn Flanders. A Form 1099–MISC is not issued to the recipient of a gift. If the transfer from Holmes to them had been a

---

**6.** Cardinal Bank filed a proof of claim for $327,702.92 and a condominium filed two proofs of claim, one for $2,084.69 and the second for $3,045.16. Bank of America did not file a proof of claim. Cardinal Bank received a distribution from the chapter 7 trustee of $4,953.

**7.** Cardinal Bank filed a proof of claim for $330,142.63. It received a distribution of $41,700.65 from the chapter 7 trustee.

**8.** It is not clear how many short sales Holmes was involved in. He testified that he was involved in over 400 transactions, but it is not clear that all were short sales.

gift, a Form 1099–MISC would have been issued to Holmes who earned the money and would have been responsible for the income taxes on the income, not to Karen or Kathryn Flanders who would not have been responsible for the income taxes. Starlight also documented the payments as consulting fees to Kathryn and Karen Flanders on its ledger, which is consistent with issuing a Form 1099–MISC but inconsistent with a gift to them. However, the "consulting fee" entry was made on December 1, 2010, not in May 2010 when the "consulting fees" were supposedly earned or on June 7, 2010, when the promissory notes representing payment of the "consulting fees" were created.

A Form 1099–MISC should properly have been issued to Scott and Brett Flanders if they had been partners in the transaction. If they were partners, the profits they received were income to them. The transfers from them to their wives were still gifts and the Forms 1099–MISC should have issued to Scott and Brett Flanders, not Karen and Kathryn Flanders.

Kathryn Flanders objected to any finding that her claim was originally obtained by defrauding Cardinal Bank. She pointed out that none of the short sale documents were presented in evidence, and, specifically, that there was no evidence of the representations made to Cardinal Bank. She argued that without knowing what representations were made to Cardinal Bank to obtain its consent to the short sale, the court cannot find that a false representation was made. Holmes disclaimed knowing what documentation was submitted to Cardinal Bank. He testified that his staff conducted the negotiations with Cardinal Bank and that he was not involved in them. He acknowledged that banks typically requested an arms length certification in short sale transactions, but did not know if Cardinal Bank had requested one.[9] He had participated in numerous short sales.

■ The court's findings of fact and conclusions of law are based on the evidence presented and the reasonable inferences drawn from it. Fraud is rarely openly acknowledged and courts usually rely on circumstantial evidence to resolve the issue. *Ins. Co. of North America v. Cohn (In re Cohn)*, 54 F.3d 1108, 1118–1119 (3rd Cir.1995) ("We acknowledge that because a debtor will rarely, if ever, admit that deception was his purpose, [intention] is extremely difficult for a creditor to prove by direct evidence. Thus, we ... [hold] that the intent to deceive can be inferred from the totality of the circumstances, including the debtor's reckless disregard for the truth."); *Brickhouse v. Orts (In re Orts)*, 2009 WL 903259 (Bankr. E.D.Va. Feb. 24, 2009); *Riggs Nat'l Bank v. Ross (In re Ross)*, 180 B.R. 121, 130 (Bankr.E.D.Va.1994) ("[F]raud need not be expressly shown. Rather, it may be proven by persuasive circumstantial evidence."); *Bartl v. Garfinkel (In re Claxton)*, 30 B.R. 199, 212 (Bankr.E.D.Va.1983) ("[T]he evidence may be, and generally will be, circumstantial only."). Fraud should be inferred when the facts and circumstances lead to the conclusion that a debtor attempted to put his property be-

---

9. Cardinal Bank obviously did not have full knowledge of the whole transaction – both the short sale and Starlight's resale of the property. It is difficult to conceive that Cardinal Bank would allow more than $65,000 to slip through its fingers and then sue the very recipients to recover it and the remaining balance. Holmes inferentially suggested that Cardinal Bank was too inexperienced or foolish not to request further information or to place further restrictions on the short sale, but, at the same time disclaimed all knowledge of the short sale negotiations with Cardinal Bank or the documentation of it.

yond the reach of his creditors with the intention of preventing them from recovering their just debts. *Hyman v. Porter (In re Porter)*, 37 B.R. 56, 63 (Bankr.E.D.Va. 1984).

Certain circumstantial evidence appears so frequently in fraud cases that it has become known as badges of fraud. *Bartl*, 30 B.R. at 212 (Bankr.E.D.Va.1983); *Hutcheson v. Savings Bank*, 129 Va. 281, 284, 105 S.E. 677, 680 (1921); *Young v. Willis*, 82 Va. 291 (1886). *Hutcheson*, quoting *Hickman's Ex'r. v. Trout*, 83 Va. 478, 3 S.E. 131 (1887) states:

> The usual badges of fraud are: Gross inadequacy of price; no security taken for the purchase money; unusual length of credit; bonds taken at long periods; conveyance in payment of alleged antecedent indebtedness of father to son residing together.

*Hutcheson v. Savings Bank*, 129 Va. at 291, 105 S.E. at 681.

*Hyman v. Porter* summarizes them:

> The badges of fraud have been stated to include: (1) retention of an interest in the transferred property by the transferor; (2) transfer between family members for allegedly antecedent debt; (3) pursuit of the transferor or threat of litigation by his creditor at the time of the transfer; (4) lack of or gross inadequacy of consideration for the conveyance; (5) retention or possession of the property by the transferor; and (6) fraudulent incurrence of indebtedness after the conveyance.

*Hyman*, 37 B.R. at 63. *Hyman* continues:

> Neither family relationship between the transferor and the transferee by itself nor insolvency standing alone is a badge of fraud. *See, Fowlkes v. Tucker* [164 Va. 507], 180 S.E. [302] at 305 [ (1935) ]. However, the Virginia Supreme Court has stated that "where the transaction assailed is between . . . near

relatives, only slight evidence is required to shift the burden of showing its bona fides." 180 S.E. at 305. In addition, the Virginia Supreme Court has often stated:

> A transaction may of itself, and by itself, furnish the most satisfactory proof of fraud, so conclusive as to outweigh the answers of the defendants, and even the testimony of witnesses.

*Id.; see also, Hutcheson v. Savings Bank of Richmond*, 105 S.E. at 680. Finally, insolvency taken together with other circumstances may show sufficiently fraudulent intent. *McClintock v. Royall*, 173 Va. 408, 4 S.E.2d 369 (1939).

*Id.*

The facts and circumstances present in this case lead to the conclusion that the parties intended to—and to date have successfully—defrauded Cardinal Bank. The common indicia of fraud are present. There were transfers between family members. The intermediate transfers were between the Flanders and Starlight, a very friendly, trusted limited liability company. Scott and Brett Flanders retained an interest in the profits from the resale of the property. They transferred their "profits" to their wives. The transfer to their wives was without any consideration. The money was held in the wives' names by Starlight until the husbands' bankruptcies had been completed.

Cardinal Bank was pursuing the Flanders for payment of the note. The Flanders knew that there would be a deficiency and that Cardinal Bank would not release them from it. Suit was filed shortly after the closing on the short sale and a default judgment was entered on July 23, 2010, less than four months after the first closing. This was a significant liability for the Flanders, sufficient to force both into

bankruptcy. Scott Flanders knew that Cardinal Bank was pursuing him. He told Brand that he would likely file bankruptcy.[10]

**10.** The Flanders' schedules show that they had difficulties with other creditors as well. Scott Flanders' schedules reflect greater difficulties than his brother's schedules suggest. They are confusing with respect to Bank of America and whether there was one or two loans on one or two condominium units. He listed Bank of America with the description "Consideration: Foreclosure deficiency." Question 5 of the Statement of Financial Affairs states that there were no foreclosures within one year prior to filing the petition. Question 4b states that Bank of America attached or seized a condominium valued at $115,000 within one year prior to the petition. He did not identify the condominium unit that gave rise to these entries. He scheduled a condominium unit known as 175 Yellowstone Drive, Unit 203, Charlottesville, Virginia, on Schedule A and listed Bank of America as a creditor with a claim for $105,000 secured by a first deed of trust on it on Schedule D. He estimated the value of the condominium unit at $85,000 which was $20,000 less than the debt secured by the property. The Unit Owners Association of Parkside at Eagles Landing filed two proofs of claim for unpaid condominium fees. Neither identified the unit number involved. The amounts and the dates of nonpayment differ. One was filed as secured claim and the other as an unsecured claim which supports the notion that there were two condominium units, one of which was sold at foreclosure or otherwise surrendered to the bank and the other of which was still owned by Flanders when he filed his petition. It appears that there were two units and two loans from Bank of America and that Flanders had lost one to Bank of America and was having difficulties with the second one.

Scott Flanders listed BB & T Bank as a secured creditor on Schedule D with a second deed of trust in the amount of $100,000 on "Residence—Pine Tree Drive." He valued the property at $700,000. He listed his wife as the codebtor on an obligation to BB & T in Schedule H. No first trust was listed. He listed his residence address as on Pine Tree Drive on the petition, but the Pine Tree Drive property was not listed as an asset. He did schedule a "Beneficiary interest in Flanders Family Trust" which appears to own his residence. *See* Schedule B, Item 19. He valued his interest at "$0.00." There were no reported transfers within ten years prior to the filing of the petition to a self-settled trust or similar device of which the debtor was a beneficiary. *See* Statement of Financial Affairs, Question 10b.

The answer to Question 3 of the Statement of Financial Affairs also shows that Scott Flanders was having difficulties with his creditors. He was not making regularly scheduled monthly payments. Question 3b asks for all payments to creditors made within 90 days before the petition was filed. (Question 3a is the same question for individuals with primarily consumer debts.) The answer was "none". Three loans scheduled as secured debts owed to two different banks on Schedule D list the creditors' addresses as "Special Loan Servicing" and "Roanoke Recovery (continued . . .) Department." One was BB & T with a second trust on the Pine Tree Drive property. These addresses for the two creditors are consistent with no payments having been made at least during the 90 days prior to the filing of the petition.

Finally, Scott Flanders' Schedules I and J, his current income and expenses, show a net deficit of $1,686.00 a month. While the Schedules and Statement of Financial Affairs show Flanders' financial difficulties, they also show that he was solvent. His assets totaled $1,597,702 with liabilities of $1,348,000 for a net worth of $249,702, all of which was exempt.

Brett Flanders' schedules also show creditor problems. Statement of Financial Affairs, Question 10, "Other Transfers," lists two transfers, his December 2009 transfer of his SAIC stock valued at $100,000 to Kathryn Flanders, his wife, and a May 2009 transfer of real property in Vienna, Virginia, to Starlight LLC. The property was a single family residence valued at $225,000. At that time, Starlight was purchasing distressed properties at short sales. His distress was not likely as painful as his brother's. Unlike Scott, Brett stated that he had made his monthly mortgage payments on his home for the three months prior to filing. There was, however, no payment reported to his second trust lender. *See* Statement of Financial Affairs, Question 3 and Schedule D. His income and expense schedules, Schedules I and J, showed $35.00 net income. Like his brother, he was solvent. His Summary of Schedules shows

The true nature of the complete transaction was concealed from the Flanders' principal creditor, Cardinal Bank. Holmes testified that he used Starlight because it avoided questions to him about his involvement, that is, it gave the false impression that he had no interest in the short sales except as a real estate agent when in fact he received a portion of the profit from the resale of the property. The settlement statement that was sent to Cardinal Bank did not show any money being paid to their borrowers, that is, the Flanders. The settlement statement sent to Cardinal Bank only showed half of the deal, the short sale to Starlight.

The purchase by Starlight and the resale to the ultimate owners were part and parcel of one transaction. The two sales were close in time and, most likely, the contractual documents—the short sale agreement with Cardinal Bank and the sales contract with the ultimate owners— were signed almost simultaneously. The Flanders and Holmes each received about one-third of the "profits" from the combined transactions. The profits were calculated taking into account the costs of the purchase by Starlight, the cost of the money it used to acquire the property and hold it and the real estate commissions on both sales. They each received $20,400 when the property was resold which they gave to their wives. Starlight held the "profits" until, in Karen Flanders' case, her husband had been granted a discharge in bankruptcy. Starlight's ledger wrongly called the payments to the wives "consulting fees."

Ms. Flanders' claim is rooted in fraud and she knew the true nature of the transaction or was recklessly indifferent to the truth. She knew of her husband's investment in Lovettsville, the dramatic change in the real estate market and the substantial loss that he had incurred. She knew the family finances were in trouble. She accepted a transfer of her husband's SAIC stock in December 2009. She accepted a "gift" of his "profits" from the sale of the Lovettsville property in June 2010, although she knew that the loan was not paid in full. She asserted that the money was a gift from Holmes but received a Form 1099–MISC which reported it as her income, not as a gift. She knew that she had done nothing to earn the $20,400. She was so deeply involved in the matter, that she either knew what was really happening or willingly closed her eyes to it—which is reckless indifference to the truth.

Determining the allowance or disallowance of claims is one of the most basic functions of a bankruptcy court. It is a core proceeding. 11 U.S.C. § 157(b)(2)(B). Bankruptcy courts have broad equitable powers to "to inquire into the validity of any claim asserted against the estate and to disallow it if it is ascertained to be without lawful existence." *Pepper v. Litton,* 308 U.S. 295, 305, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939); *Meindl v. Genesys Pacific Technologies, Inc. (In re Genesys Data Technologies, Inc.),* 204 F.3d 124, 129 (4th Cir.2000).

The underlying transaction was not a lawful transaction. It was a fraud. A bankruptcy court is a court of equity and cannot allow itself to be used to effectuate a fraud, in this case, to distribute estate funds to a creditor where the distribution itself would complete the fraud. In addition, the transfer of the underlying claim to Ms. Flanders was itself a fraudulent conveyance, a transfer from Brett

assets of $1,204,968 and liabilities of $819,206, for a net worth of $385,762, all of which was exempt.

Flanders to his wife for no consideration. It was improper and both facilitated and concealed the underlying fraud.

The question left is the appropriate resolution of the objection to the proof of claim. While the funds should have gone to Cardinal Bank at the March 31, 2010 settlement, it has not filed a proof of claim in this case and is not a scheduled creditor.[11] In the absence of Cardinal Bank, the proceeds, rather than being distributed to Ms. Flanders and thereby completing a fraud, will be disbursed to creditors of this estate. *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281; *In re Sisson*, 2008 WL 245798, *2 (Bankr.E.D.Va. January 28, 2008) ("[A] bankruptcy court, as a court of equity, may sift the circumstances surrounding a claim to prevent injustice and may subordinate claims of controlling stockholders to prevent injustice.")

The debtor should not benefit from its participation in the illicit transaction. In this case it will not. It is no longer operating, will not receive a discharge and will be left with no assets.

The proof of claim will be disallowed.[12]

---

11. The court recognizes that there may be interesting questions about a claim by Cardinal Bank, such as whether Cardinal Bank has a claim to the entire $20,400 or is a creditor who would share pro rata with all other creditors and, if so, the extent of its claim. *See, e.g., In re Stuckey*, 126 B.R. 697 (Bankr. E.D.Va.1990). In addition, Holmes inferentially suggests that Cardinal Bank was not defrauded, but was simply inexperienced or foolish. Nonetheless, if Cardinal Bank was not defrauded, Brett Flanders and Scott Flanders failed to schedule all of their assets and failed to disclose transfers from them to their wives.

12. Subordination to all other creditors is an alternative remedy that achieves the same result. 11 U.S.C. § 510(c); *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238.