30 B.R. 199 (1983)
In the Matter of Philander P. CLAXTON, III, Bankrupt.
Richard A. BARTL, Receiver in Bankruptcy, Plaintiff,
v.
Stephen E. GARFINKEL, Trustee,
and
Susan P. Williams, Defendants.
Bankruptcy No. 79-684-A, Complaint No. 7.
United States Bankruptcy Court, E.D. Virginia, Alexandria Division.
May 12, 1983.
*200 *201 *202 *203 Richard J. Stahl, Annandale, Va., for bankrupt.
Richard A. Bartl, Alexandria, Va., Trustee in Bankruptcy, for debtor.
Robert O. Tyler, Alexandria, Va., for Richard A. Bartl.
Stuart H. Gary, Fairfax, Va., for Classic Homes, Inc.
George P. Doss, Alexandria, Va., for Stephen E. Garfinkel.
Ronald L. Walutes, Annandale, Va., trustee for Watkins Corp.
John S. Stump, Fairfax, Va., for Ronald Walutes.
Ronald Ingoe, Fairfax, Va., and Karl W. Pilger, Washington, D.C., for Susan P. Williams.
Patrick J. Moran, Washington, D.C., for defendant Williams and Bandierante Corp.
Carl F. Bowmer, Richmond, Va., for Susan Williams on jurisdictional issues.

MEMORANDUM OPINION
MARTIN V.B. BOSTETTER, Jr., Bankruptcy Judge.
The issues here arise on the complaint of Richard A. Bartl, Receiver in Bankruptcy[1], seeking a determination by the Court to have declared null and void two deeds of conveyance executed upon foreclosure sales of real property formerly held by the bankrupt, Philander P. Claxton, III ("Claxton, III").
The property in controversy consists of approximately 7.3 acres, with a residence ("the property"), of which the bankrupt was, until May 22, 1979, the record owner. Several creditors of Claxton, III filed an involuntary petition in bankruptcy against him on June 26, 1979, slightly more than one month following his transfer of the property to Classic Homes, Inc. ("Classic"). Subsequent to the filing of the petition, defendant Susan P. Williams ("Williams") purchased the property at successive foreclosure sales held August 31, 1979 and September 12, 1979 by direction of the holders of the third and second deeds of trust. Defendant Stephen E. Garfinkel ("Garfinkel"), as trustee under both deeds of trust, conveyed the property to Williams following each of the sales. Further facts will appear as they relate to the issues to be determined.
As a threshold matter, defendant Williams has moved to dismiss this proceeding and raised a "suggestion of lack of subject matter jurisdiction" of this Court to deal with conflicting claims to the property. Williams questions whether this Court may *204 consider a challenge to the validity of the transfers to her when title to the property at the time of the conveyance was no longer in the bankrupt but in Classic Homes, Inc.
Section 70a of the Bankruptcy Act of 1898 ("the Act")[2] vests in the Trustee in Bankruptcy title to all the bankrupt's nonexempt property as of the date of the filing of the petition[3]. Under subsection a(4) of Section 70, the title of the Trustee in Bankruptcy extends to property transferred by a bankrupt "in fraud of his creditors." (Bankruptcy Act of 1898, § 70a(4); 11 U.S.C. § 110a(4) (repealed) (cited hereafter as "Bankruptcy Act"). See also, Bankruptcy Act, § 70a(5).)
The Act defines as fraudulent any transfer made or incurred within one year prior to the filing of a petition in bankruptcy which is either (a) made without fair consideration by a debtor who is or thereby becomes insolvent, or (b) made with actual intent to hinder, delay or defraud creditors. (Bankruptcy Act § 67d(2).) Section 67, subsection d(6), states that any such transaction "shall be null and void against the trustee...." (Bankruptcy Act § 67d(6).) Section 67d(6), however, is not self-executing. Rather it requires the Trustee in Bankruptcy to act affirmatively to recover the property and bring it into the bankruptcy estate for the benefit of creditors. (4 Collier on Bankruptcy (14th ed.), ¶ 67.41[3] at 585 and cases cited therein.)[4] Defendant's argument that this Court lacks jurisdiction because at the time the petition was filed the bankrupt no longer could have transferred the property is without merit. The ancient right asserted by the Trustee in Bankruptcy derives by operation of law not from the bankrupt but from the creditors of the bankrupt and dates from the Statute of 13 Elizabeth. (Bush v. Export Storage Co., 136 F. 918 (E.D.Tenn.1904).) Under Section 70e(2), the Trustee in Bankruptcy may follow the property into the hands of anyone who may have received it. (Id.; See also, 4B Collier on Bankruptcy (14th ed.), ¶ 70.92[5] at 1067-1068.)
Section 2 of the Act confers upon the Bankruptcy Court jurisdiction over all of a debtor's non-exempt property and subsection a(7) of Section 2 expressly grants to said courts the power to "[c]ause the estates of bankrupts to be collected...." (Bankruptcy Act § 2a(7).)[5] This Court could lack subject matter jurisdiction over the instant proceedings only if they did not relate in any way to the estate of the bankrupt. Claxton, III transferred the property at issue within one year of the filing of the petition, an action that rendered the transfer subject to judicial scrutiny as allegedly having been accomplished in fraud of creditors. Accordingly, this Court has subject *205 matter jurisdiction to hear disputes concerning the property[6].
The Trustee in Bankruptcy argues that defendant Williams confuses subject matter jurisdiction with this Court's summary jurisdiction under the Bankruptcy Act. When there has been a pre-petition transfer of property by the bankrupt, the transferee may object to the summary jurisdiction of the Bankruptcy Court and demand a plenary proceeding in the District Court. (Bankruptcy Act § 2a(7).) Under Section 2a(7) and Bankruptcy Rules 712 and 915, such an objection must be raised timely, either by pre-answer motion or in the answer, whichever is served first. Otherwise the objection is waived. Williams filed her motion on November 5, 1980, three months after filing of the answer, or untimely.
Defendant Williams argues, however, that she also raised the question of jurisdiction in her answer. In Count I, paragraph 5 of her answer she "states" that this Court lacked jurisdiction to enter the order by which the receiver avoided Claxton, III's transfer of the property to Classic.
Assuming that the Court should treat the language in Williams' answer as a properly asserted objection, the objection can apply only to subject matter jurisdiction and on that issue Williams cannot prevail for the reasons stated above. There is nothing further in the answer filed by Williams which the Court can construe as an objection to summary jurisdiction of her own claim. Accordingly, the Court finds that Ms. Williams has not properly raised any objection to summary jurisdiction.
In addition, the Court notes that Williams appears to address her objection to the exercise of summary jurisdiction over the conflicting claims of the Trustee in Bankruptcy and Classic Homes rather than asserting it as to her own claim. At minimum, her assertion that such exercise of jurisdiction was improper forms the basis for her objection to this Court's jurisdiction over her claim to the property. The Bankruptcy Court may exercise summary jurisdiction regardless of objections if the Court determines that the objecting transferee's claim: (1) is not adverse to the estate (e.g., property held by an agent or bailee of the bankrupt), or (2) is only colorable (cannot be substantiated). (See, e.g., Loyd v. Stewart & Nuss, Inc., 327 F.2d 642 (9th Cir.1964).) When a potentially adverse claimant objects to summary jurisdiction, the determination of whether the claim actually is adverse is made on the facts as they existed at the time of the filing of the petition. If the Court determines that the claim was not adverse on that date the Court may exercise summary jurisdiction. (American Mannex Corporation v. Huffstutler, 329 F.2d 449 (5th Cir.1964).
Here, Classic was the record owner of the property on the date of filing of the petition. As such, it was an adverse claimant to the property. On the date of the filing of the petition against Claxton, III, Williams had no claim to the property. Her title arose no earlier than August 31, 1979 or two months after the filing of the petition. Possession obtained subsequent to bankruptcy does not make the party an adverse claimant. (South Falls Corporation v. Rochelle, 329 F.2d 611 (5th Cir.1964).) Classic Homes, whose deed the receiver was seeking to avoid, could have objected to summary adjudication. Classic, however, consented to this Court's jurisdiction. Defendant Williams, who asserts an objection in this separate proceeding and whose claim arises only after the filing of the petition, has no standing to challenge this Court's summary jurisdiction over Classic's claim in the former action. Accordingly, the Court finds that even if the objection of Williams to this Court's jurisdiction had been otherwise *206 properly and timely asserted, it must be overruled.
Defendant Williams also argues that the order of this Court which avoided the transfer of the property from Claxton, III to Classic should be declared null and void. Williams contends that as titleholder of record when the order was entered she was a necessary or indispensable party to any action that would cloud her title to the property. In addition, Williams states that she received no notice of the proceedings which led to entry of the order and that this failure to notify of a proceeding which would jeopardize her interest in the property was a violation of her Constitutional right to procedural due process.
Williams' argument that she was a necessary party to the dispute between Classic and the receiver is based upon Rule 719 of the Rules of Bankruptcy Procedure. Bankruptcy Rule 719(a) states, in pertinent part, that a person:
shall be joined as a party in the proceeding if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the proceeding and is so situated that the disposition of the proceeding in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.
(Rule 719(a), Rules of Bankruptcy Procedure.) Bankruptcy Rule 719 is adapted from Rule 19 of the Federal Rules of Civil Procedure and for purposes of making the determination required here the relevant factors to be considered are identical.
The general rule of the cases is that a subsequent purchaser of disputed property should be joined. (See, Chiodo v. General Waterworks Corp., 380 F.2d 860 (10th Cir.1967), cert. denied 389 U.S. 1004, 88 S.Ct. 562, 19 L.Ed.2d 599 (1967).) However, when the court can afford complete relief to those already parties and disposition of the action will not impair the absent party's ability to protect his interest, the court may proceed. (Trail Realty, Inc. v. Beckett, 462 F.2d 396 (10th Cir.1972).) In this case, the relief sought was the voiding of Claxton, III's deed to Classic, and both the receiver and Classic were before the Court. No other persons were required for the purpose of effecting that action. The effect of the order voiding Classic's deed was to return record title to the bankrupt and, by operation of law, vest that title in the receiver. This event placed defendant Williams in the position of having to defend her title which derived from the deed to Classic. This Court's order did not, however, impair or impede her ability to defend her interest. Had the Court undertaken to decide issues regarding the validity of Williams' interest in the property, such action would have impaired her ability to defend her title. The Court took no such action. In the instant proceeding, indeed, Williams has been and will be afforded a full opportunity to defend her title to and interest in the property.
In addition, the Court notes that the language of the rule demands an inference that a request for joinder be raised as a preliminary matter. By the time of the action between Classic and the receiver, in June 1980, Claxton, III and Williams were husband and wife, a fact which was not disclosed to the Court until several months after the trial of the instant complaint. As the wife of Claxton, III, it follows that Ms. Williams must be charged with actual knowledge of the pendency of the complaint against Classic. Williams could have moved to intervene or be added as a party at that time. By refraining from doing so, she and Claxton, III obtained further time in which to attempt to transfer the property in a manner which would have cut off its recovery by the Trustee in Bankruptcy.
The remedy, when a demand for joinder is successful, is for the Court to order the person to be joined. If for any reason the person cannot be joined, the Court may consider dismissing the action (so that the plaintiff may seek a remedy in another court), but the Court is not required *207 to do so. In any case, failure to join a party, even a "necessary" party does not deprive a court of subject matter jurisdiction or subject the court's action to attack by other than the traditional means of appeal. Susan Williams had no standing to appeal this Court's order of June 3, 1980 because she was not a party to the action. Similarly, in the instant proceeding, which is a separate suit involving the same parcel of real property, Williams has no standing to attack collaterally the order entered in the prior action. Regarding the validity of her title to the property, Williams in the trial in this proceeding has had her "day in court".
The due process argument advanced by Williams also is without merit. The Fifth Amendment to the Constitution states, in pertinent part, that "[n]o person shall be ... deprived of life, liberty, or property without due process of law." (U.S.Const. amend. V.) The Court's order of June 3, 1980, voiding Claxton, III's deed to Classic did not deprive Williams of any property. The effect of the order was to put the Trustee in Bankruptcy in a position to challenge Williams' title by bringing this complaint. If the property is to be taken from Williams, it will be done through this proceeding, of which Williams had notice and in which she has been afforded a full opportunity to be heard.
In support of her argument, Williams cites Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). That case, however, is clearly distinguishable from the case at bar. In Fuentes, the Supreme Court held that the replevin laws of Florida and Pennsylvania violated due process language in the 14th Amendment by permitting repossession of chattels without a prior opportunity for a hearing. Here, as noted, no property has been taken. Williams argues that entry of the order by this Court clouded her title to the property making said title unmarketable. By depriving her, at least temporarily, of her ability to transfer the property, Williams argues the Court has effectively "taken" the property. The Court notes, however, and the evidence adduced at trial demonstrates, that Williams' title was unmarketable well prior to June 3, 1980[7]. It cannot be argued that requiring one to defend one's title to property in a court proceeding is a "taking" of that property.
Williams argues further that this Court had no jurisdiction to enter the order voiding Claxton, III's deed to Classic because Classic was a bona fide purchaser for value of the property. Section 67d(6) of the Bankruptcy Act protects a transferee of a bankrupt's property who is bona fide purchaser for value. The Trustee in Bankruptcy admits that Classic was a bona fide purchaser but argues that the transaction was not for "value". Classic had an opportunity to defend the conveyance as a bona fide purchase for value but chose to settle the action. Regardless of the actual merits of the arguments advanced however, defendant Williams has no standing to challenge an order entered in another proceeding.
Williams also argues that this Court lacks jurisdiction to hear this matter as a result of the Supreme Court's recent decision in Northern Pipeline Construction Co. v. Marathon Pipe Line Co., ___ U.S. ___, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). In Marathon, the Supreme Court held that the expanded jurisdiction which was granted to bankruptcy judges in the Bankruptcy Reform Act of 1978 was unconstitutional. The bankruptcy of Claxton, III is, as previously noted, governed by the earlier Bankruptcy Act. The essence of Williams' argument, accordingly, is that this Court may not hear matters in cases begun under the Bankruptcy Act unless it would have had *208 authority to hear those matters if the Bankruptcy Reform Act had never been enacted. This argument is nothing more than a restatement of Williams' objection to this Court's exercise of summary jurisdiction which the Court has overruled.
Accordingly, and for all the foregoing reasons, the objections of defendant Williams to the jurisdiction of this Court are overruled. Similarly, the motion to dismiss this proceeding based upon said objections is denied.
Claxton, III, the bankrupt herein, originally purchased the property in question in 1976. The sellers, Mr. and Mrs. Samuel T. Neel took back a first deed of trust in the approximate amount of $335,000.00. Claxton, III later obtained a new first trust for $200,000.00 and the Neels then took a second trust for the unpaid balance remaining. The property conveyed consisted of 7.3 acres with a residence in McLean, Virginia.
In December 1978, Claxton, III executed a sales contract to sell 5.3 acres of the property to Classic Homes, Inc. The terms were $100,000.00 cash plus $300,000.00 under a deed of trust and note. In April 1979, apparently concerned that Claxton did not intend to convey under the contract, Classic filed suit for specific performance in Fairfax County Circuit Court. On April 20, 1979, the parties settled this suit and the Circuit Court entered a consent decree. The settlement terms, as stipulated by the parties and approved by the Circuit Court were as follows: Claxton, III could encumber the property up to a maximum of $400,000.00; Claxton, III was required to execute an escrow deed conveying to Classic the full 7.3 acres of the property, rather than only the 5.3 acres in the sales contract; in the event Claxton, III defaulted, Classic would have the right to record the escrow deed and obtain title to the entire parcel; if Classic exercised its right to record the escrow deed, it would take subject to all liens of record and assume all debts encumbering the property at that time.
During the first week of May 1979, Claxton, III placed upon the property four additional deeds of trust totalling $520,000.00. These encumbrances were as follows: a $100,000.00 deed of trust to his parents, Mr. and Mrs. Philander P. Claxton, Jr. (the "third" deed of trust), a $20,000.00 deed of trust to Edward M. Waibel (the "fourth" deed of trust), a $300,000.00 deed of trust to Allen & Co. and others (the "fifth" deed of trust); and a $100,000.00 deed of trust to Union First National Bank of Washington (the "sixth" deed of trust). Classic, upon discovering that Claxton, III had violated the terms of the consent decree by encumbering the property beyond the $400,000.00 limit, recorded its escrow deed on May 22, 1979.
During this time, Claxton, III was the chief executive officer of the Watkins Corporation ("Watkins"), of which he was also the founder. On May 10, 1979 Watkins filed a voluntary petition in bankruptcy in this Court pursuant to a resolution of the corporation's Board of Directors a few days earlier. Edward M. Waibel ("Waibel"), holder of the fourth deed of trust, was a former employee of Watkins. Allen & Co., holder of the fifth deed of trust, was an investor in Watkins and the consideration for the $300,000.00 deed of trust granted to it was the purchase by Claxton of Allen & Co.'s stock in Watkins.
Samuel F. Neel, ("Neel") from whom Claxton had purchased the property and who still held the second deed of trust, was chairman of the board of Watkins until his resignation upon the filing of Watkins' petition here. By early May 1979, however, Neel had "become disenchanted" with Claxton, III and had initiated foreclosure proceedings on the property.
This foreclosure sale, the first of three held that summer, took place June 27, 1979, the day following the filing of the involuntary petition against Claxton, III. The successful bidder was Philander P. Claxton, Jr., the bankrupt's father ("Claxton, Jr.") at a price of $500,000.00 above the first deed of trust of $200,000.00 for a total of $700,000.00. Claxton, III, concerned about covering the six deeds of trust then on the property, had suggested bidding at the sale to his father. Claxton, Jr. posted the required *209 deposit but was unable to close the transaction. For settlement, Claxton, Jr. proffered to the trustee notes and what appeared to be agreements from the junior lienholders to accept those notes in lieu of cash. Claxton, Jr. further offered to provide the trustee with indemnification if the trustee would accept the notes. The trustee, however, refused because the advertised terms for the sale did not provide for payment with notes and because he was uncertain about (1) the effect of Claxton, III's involuntary bankruptcy and (2) the circumstances surrounding the recording of the escrow deed and the junior liens. Neel then scheduled a second foreclosure sale for August 21, 1979.
In the meantime, Claxton, Jr. had negotiated a contract to sell the property to George P. and Angela D. Shafran ("Shafran"). This contract was contingent upon Claxton, Jr.'s obtaining title to the property. When Claxton, Jr. was unable to complete the first foreclosure, he determined to buy out Neel and began to negotiate to that end. Claxton, Jr. also scheduled a foreclosure sale on his own third deed of trust for August 31, 1979 in order to guarantee that Classic would be divested of record title.
Claxton, Jr.'s efforts to purchase Neel's interest in the property succeeded after he offered, in addition, to buy Neel's shares of the bankrupt Watkins Corporation for their original price of $50,000.00. Further terms of this transaction included the resignation of the trustee who had refused to convey to Claxton, Jr. under the first foreclosure sale. Claxton, Jr. thus became the holder of both the second and the third deeds of trust and defendant Garfinkel was then appointed substitute trustee. On August 9, 1979, Classic filed suit to quiet title and obtained a temporary restraining order blocking the August 21, 1979 sale which had been scheduled by Neel. This suit, which still was pending at the time of trial, involved only the fourth, fifth and sixth deeds of trust. Accordingly, there were no barriers against the sale set by Claxton, Jr. for August 31, 1979 on his third deed of trust, and the sale went forward with Susan P. Williams the successful bidder. The temporary restraining order obtained by Classic expired when Classic failed to press its case for a permanent injunction on the scheduled hearing date of September 5, 1979. Foreclosure on the second deed of trust, recently purchased from Neel by Claxton, Jr. accordingly went forward September 12, 1979 with Williams again the successful bidder.
Defendant Garfinkel had known Claxton, III approximately five years at the time of these foreclosure sales. Garfinkel had been the bankrupt's flying instructor, a relationship that led to friendship. In August 1979 when Garfinkel agreed to become substitute trustee on the two deeds of trust held by Claxton, Jr., he was acquainted also with Claxton, Jr. and Williams. Claxton, III advised Garfinkel on the reports required of a trustee and assisted him in obtaining an attorney who was familiar with the circumstances under which the sales were being planned. Garfinkel understood his selection as substitute trustee to have been based upon a state law requirement that such trustees be Virginia residents.
The only printed advertisement for either sale admitted into evidence specified "[c]ash, or other terms acceptable to the trustee." (Plaintiff's Exhibit 1.) There was conflicting testimony regarding whether the terms as announced by the auctioneer at the actual sales were "cash" or "cash or terms." On August 31, 1979, however, Williams tendered, and defendant Garfinkel accepted, personal, unsecured, non-interest bearing notes to the holders of the third, fourth and fifth trustholders and to Garfinkel for the trustee's fee. At the September 12, 1979 sale, Williams, by then the record owner of the property, tendered only a single note payable to the holders of the second trust, Mr. and Mrs. Claxton, Jr. No cash, note or any form of payment apparently was offered to Union First National Bank on its sixth deed of trust at either sale. No cash deposit was demanded or given at either sale.
Defendant Williams testified that the only cash paid by her at either sale was for *210 recording the deeds transferring the property to her. Garfinkel signed reports to the Commissioner of Accounts for Fairfax County, where the property is located, indicating that as trustee he had paid such items as advertising costs and auctioneers' fees. However, Garfinkel testified that he had not made any such payments. Rather, he believed Claxton, Jr. had done so. In addition, the reports signed by Garfinkel indicate that he received $450,000.00 at the August 31 sale and $105,900.15 at the September 12 sale. Garfinkel testified, however, that he had received notes only, even for his fee as trustee. Further, although these reports indicate actual payment of the various liens against the property, Garfinkel testified that he disbursed notes made by Williams to the holders of the liens. The Commissioner of Accounts had not approved the report of either sale by the time of the trial.
Williams testified that she learned of the August 31, 1979 sale from Claxton, III who also told her she could buy the property by putting up notes. Claxton, III helped her prepare the notes, and she typed them herself. Williams expected to pay off these notes by the end of September 1979 out of the proceeds of the contract between the Shafrans and Claxton, Jr. which contract Claxton, Jr. would assign to her.
Susan Williams testified further that Claxton, III was living in the property when she purchased it. She stated that she then made a six-month lease with him at $3,000.00 per month. Claxton, III paid her one and one-half month's rent in cash in October 1979 and in December 1979 had given her the furnishings in the house in lieu of rent.
In March 1980, Williams obtained another tenant, also through the efforts of Claxton, III. This new tenant was the wife of a man with whom Claxton, III was imprisoned in Florida. Williams testified that a Florida company whose name she could not recall had tendered a lease and deposited a "large figure", possibly $225,000.00 to a bank account she kept for the property. However, this deposit apparently never cleared, and it is unclear if the lease ever was signed. Williams stated that she was uncertain of the whereabouts of the tenant who technically still was occupying the property.
In the meantime, both Williams and Claxton, Jr. actively had been trying to clear up the status of the property. In August 1979, to obtain the funds to buy out Neel, Claxton, Jr. had endorsed over to Union First National Bank two notes of Claxton, III which were secured, respectively, by the second and third deeds of trust on the property. In October 1979, Claxton, Jr. attempted to obtain the bank's agreement to substitute notes made by Susan Williams for the endorsed, secured notes of Claxton, III. Susan Williams offered the bank a contract assigning to it the proceeds of the Shafran contract. She tried to assume the bank's sixth deed of trust and stated that she would have been permitted to do so but for Classic's ongoing suit to quiet title. She also offered the bank a deed of trust on the property. A bank officer testified that the bank always had been willing to approve an assumption if Williams could obtain title insurance. At the time of the trial, the bank still held the endorsed notes and had refused Williams' more recent offer of a deed of trust on another property in which she had a one-half interest.
Williams stated that by the time of the trial she had expended more than $80,000.00 to hold and maintain the property. Her original intention was to pay off most of the liens from the proceeds of the sale of the undeveloped portion of the land to the Shafrans, and then to occupy the house with her sister. To this end she engaged engineers to study subdivision of the property. In December, when the holder of the first trust attempted to foreclose, she obtained an injunction. Later she arranged a purchase and assumption of the first trust which involved payment of points and fees. She testified that she had been making monthly payments of $2,475.00 to the new first trust holders. In addition, during the week prior to trial, she had paid Edward M. Waibel's $20,000.00 fourth trust in full and *211 made an installment payment of $1,500.00 on Garfinkel's note for the trustee's fee.
Regarding the sources of this money, Williams stated that some came from a deposit associated with a contract to purchase the property by the Bandierante Corporation. This contract was drawn by the attorney who represented Williams at the trial and delivered to her by Claxton, III about one week prior to the trial. Bandierante Corporation had been created recently; its formal documents were prepared by the same attorney who drew the sales contract and represented Williams at the trial. The contract to purchase the property was signed for Bandierante by a person whose signature appeared to be "Sparkle G. Diamond."
Williams stated that she had met other expenses of the property with funds from her considerable family financial resources and the income from her employment.
In earlier testimony, Claxton, III had characterized his relationship with Susan Williams as that of friend, "one of the best friends I've ever had." Williams stated that while Claxton, III was a good friend, he was not her closest, that the designation of closest friend was Claxton, III's perception only. Williams answered a question regarding her marital status as follows: "I was married in 1969 and divorced in 1977." Several months following the trial, however, the Trustee in Bankruptcy presented to the Court a marriage certificate showing that Claxton, III and defendant Williams were married at the time they gave this testimony. The certificate states that the marriage took place December 8, 1979, three months following the foreclosure sales and one year prior to this trial. The Court granted the motion of the Trustee in Bankruptcy for admission of the marriage certificate as evidence in this proceeding. In her opposition to the motion of the Trustee in Bankruptcy for admission of additional documentary evidence, Williams submitted a copy of what appears to be an ante-nuptial agreement between herself and Claxton, III. The intent expressed in this document is that each would maintain separate property after marriage.
Section 67d(2)(a) of the Bankruptcy Act states that any transfer by a debtor within one year of the filing of the petition is fraudulent as to creditors if said transfer occurs without fair consideration and the debtor is, or thereby becomes, insolvent. Such a transfer is deemed fraudulent regardless of the actual intent of the debtor. In addition, under Section 67d(2)(d), transfers made with actual intent to hinder, delay or defraud creditors may be avoided. (Bankruptcy Act §§ 67d(2)(a) and 67d(2)(d).)
Section 70e(1) of the Bankruptcy Act deems fraudulent for bankruptcy purposes any transfer of the debtor's property which would be fraudulent or otherwise voidable under state law. Section 70e(2) affirmatively states that any property "affected" by such transfer "shall be and remain" part of the bankruptcy estate and recoverable by the Trustee in Bankruptcy from "whoever may hold or have received it." (Bankruptcy Act §§ 70e(1) and 70e(2).)
Section 55-80 of the Code of Virginia declares as fraudulent any transfer of property made with intent to hinder, delay or defraud "creditors, purchasers or other persons"[8]. A purchaser for valuable consideration is protected only if he lacks "notice of the fraudulent intent of his immediate grantor or of the fraud rendering void the title of such grantor." (Va.Code § 55-80 (1981 Repl. vol.), (emphasis added).) Actual knowledge of such facts and circumstances *212 as would put a reasonable person on inquiry is sufficient. (Bank of Commerce v. Rosemary & Thyme, Inc., 218 Va. 781, 239 S.E.2d 909 (1978).)
A claim of fraud must be proved by clear, cogent and convincing evidence. (Schreyer v. Platt, 134 U.S. 405, 10 S.Ct. 579, 33 L.Ed. 955 (1890); Land v. Jeffries, 26 Va. (5 Rand.) 599 (1827); McClintock v. Royall, 173 Va. 408, 4 S.E.2d 369 (1939).) However, the evidence may be, and generally will be, circumstantial only. (Witz, Biedler & Co. v. Osburn, 83 Va. 227, 2 S.E. 33 (1883).) When the evidence demonstrates a prima facie case of fraud, it is then incumbent upon he who would sustain the validity of the transaction to establish its fairness. (Hutcheson v. Savings Bank of Richmond, 129 Va. 281, 105 S.E. 677 (1921).)
In the absence of direct and positive testimony, there are many facts and circumstances which the law admits as marks or signs of fraud and from which fraudulent intent may be inferred. (Land v. Jeffries, supra.) These "badges of fraud" include (1) close relationship of the parties, (2) insolvency of the grantor, (3) pursuit of the grantor by his creditors at the time of the transfer, (4) want or inadequacy of consideration, and (5) retention of possession of the property by the grantor. (Hutcheson v. Savings Bank of Richmond, supra.) These elements vary in persuasiveness, and the facts and circumstances relating to each determine the weight to be given by the court to any particular badge or mark. For example, relationship between the parties, by blood or affinity, calls upon the court for careful examination of the transaction, although the mere relationship itself is not a badge of fraud. (Id.) Similarly, when the grantor remains in possession that fact naturally gives rise to a presumption against the fairness of the transaction; yet mere nondelivery of possession cannot be treated as conclusive of fraud. (Davis v. Turner, 45 Va. (4 Gratt.) 422 (1848).)
Defendant Williams' claim to the property arises after the filing of the petition against Claxton, III. Claxton, III resisted adjudication as a bankrupt, and a receiver was not appointed until March 12, 1980 pursuant to the initial order of adjudication by this Court. Certain transfers by the bankrupt which occur during the period between the filing of the petition and the earlier of either adjudication or the taking of possession by a receiver may be valid under the provisions of § 70d of the Bankruptcy Act. To qualify for protection, such transfers must be for present fair equivalent value. If the transferee had actual knowledge of the pending bankruptcy, the section imposes a presumption that the transaction was not in good faith unless the transferee can show he had reasonable cause to believe the petition was not well founded. In addition, the party seeking to uphold the transaction has the burden of proof[9]. Expressly excluded from the protection of § 70d is any transfer of real property. (Bankruptcy Act, § 70d(1)-(5).) Thus, a person who is the subject to an involuntary petition, is not free to deal with his property as his own while the matter is pending and is not at liberty to transfer real property.
The foreclosure sales at which Williams purchased the property overflowed with irregularities. Instead of the normal immediate cash or equivalent payment of ten percent pending prompt settlement, defendant Garfinkel, as trustee, accepted unsecured personal notes for the full purchase price. Garfinkel then signed a report to county authorities showing the actual payment of lienholders who, in fact, had received only notes. Garfinkel was not a bank officer or an attorney but a personal friend of Claxton, III, who became trustee at Claxton, III's request, on deeds of trust held by the bankrupt's father.
Williams learned from Claxton, III that she would be permitted to purchase the *213 property with notes, which then could be paid off from the proceeds of the Shafran contract for the sale of a part of the property, which contract had been negotiated by Claxton, Jr. Williams married Claxton, III a few months after purchasing the property. Later, she apparently permitted the wife of an acquaintance with whom Claxton, III had been imprisoned to occupy the property without payment of rent.
Claxton, Jr. attempted to purchase the property the day following the filing of the involuntary petition at the foreclosure sale on the deed of trust held by Neel. He took this action at the suggestion of Claxton, III. Subsequently, Claxton, Jr. bought out Neel on terms which included purchase of Neel's shares in the bankrupt Watkins Corporation, a corporation controlled by Claxton, III. Claxton, Jr. also assigned to Williams the Shafran contract and attempted on her behalf to obtain release of Union First National Bank's secured notes.
During this entire period, Claxton, III was insolvent. This conclusion is not open to dispute given the outstanding deeds of trust on the property and the testimony adduced regarding debts stemming from Claxton, III's operation of Watkins Corporation.
Claxton, III's creditors were pursuing him actively by means of the involuntary petition in bankruptcy.
Although Classic held record title to the property on August 31, 1979, when Williams purchased it, Claxton, III was still in possession. He continued to occupy the property after the purchase by Williams. It was Claxton, III, by then Williams' husband, who brought her the sales contract from the newly-created Bandierante Corporation during the week prior to trial.
Section 67d(2)(a) of the Bankruptcy Act permits the court to avoid a transfer made for less than fair consideration while the debtor is insolvent, regardless of intent. Section 67d(2)(d) and Virginia law, which is made applicable by Section 70e of the Bankruptcy Act, both permit the avoiding of a transfer made with actual intent to hinder, delay or defraud creditors. In addition, Virginia Code § 55-80 permits a court to look back through an intermediate transfer to avoid an earlier fraudulent conveyance.
The evidence as a whole in this case indicates that the property in question has a market value of between $700,000.00 and $800,000.00. Payment by unsecured personal note cannot be said to be fair consideration in a transaction of this magnitude and would be highly abnormal in any real estate transfer.
The pattern of activity by the insolvent Claxton, III adds up to a blatant attempt to keep the property out of the bankruptcy estate. Claxton, III appears to have organized relatives and friends into a network of agents whose activities he orchestrated. By arranging a series of paper transactions, Claxton, III apparently hoped to keep the property or its proceeds for his own use. The role of Claxton, III in all the events pertaining to the property compel the conclusion that he acted with actual intent to hinder, delay and to defraud his creditors.
The fact that Williams' title arises by virtue of the foreclosure when Classic Homes was record owner, rather than directly from Claxton, III, cannot save the transaction. Although Claxton, III's deed to Classic has been avoided by consent, uncontradicted evidence presented at this trial tended to prove that the Claxton-Classic conveyance also occurred for less than fair consideration while Claxton, III was insolvent. Most persuasive are the facts that Claxton, III continued to occupy the property and that the foreclosure sales took place, a clear indication that Classic was not paying the debts it had undertaken when it recorded its escrow deed.
Accordingly, for all the reasons set forth herein, the Trustee's Special Warranty Deeds to the property dated August 31, 1979 and September 12, 1979 will be declared null and void. Garfinkel's note for a trustee's fee similarly will be avoided. The $1,500.00 installment paid just prior to trial and any other payments on such note will *214 be turned over to the Trustee in Bankruptcy. Susan Williams will be allowed a claim against the estate in an amount equal to her documented costs expended to hold and maintain the property less the $4,500.00 cash and the fair market value of the furnishings she received as rent from Claxton, III. The allowed amount of the claim will be increased by as much of the $1,500.00 paid to defendant Garfinkel as the Trustee in Bankruptcy ultimately recovers.
In February 1982, Williams filed a motion in this Court to submit newly-discovered evidence or to supplement the record. The alleged new evidence consisted of an affidavit of the attorney for Classic Homes and a copy of an alleged agreement between Classic and Claxton, III whereby Classic agreed that in the event it recorded its escrow deed to the entire property it would re-convey the two acres containing the residence, provided Claxton, III repaid all encumbrances over $400,000.00 and obtained county approval for subdividing the five-acre portion.
Rule 60(b)(2) of the Federal Rules of Civil Procedure permits submission of such evidence within a reasonable time but requires that the new evidence be such that "by due diligence [it] could not have been discovered" earlier. (Rule 60(b)(2) Fed.R. Civ.P.) Before granting such a motion, the Court must be satisfied that: (1) the proposed new evidence actually existed at the time of the trial; (2) the moving party could not have discovered the evidence earlier by due diligence; (3) the movant was diligent, and (4) the evidence is not merely cumulative, that is, that consideration of the evidence would be likely to change the result. (Wright and Miller, Federal Practice and Procedure, § 2859 (1973).)
Williams, the movant, fails to meet the criteria for submitting new evidence. There has been no showing that the document existed at the time of trial. It would be unreasonable to accept the notion that if Claxton, III had signed such a document in 1979 he would have failed to disclose its existence to his wife in time for use at the trial. The movant appears not to have satisfied either of the two diligence elements, especially in light of the access to Claxton, III's activities that her marriage provided. Finally, even if the document met these three elements of the test, there is nothing in a supposed contingent, secret agreement permitting Claxton, III to regain part of the property that would alter the Court's view of the transaction at issue here. The property still would have to come into the bankruptcy estate unless the transferees could satisfy the Court that the conveyances worked no fraud on Claxton, III's creditors. An agreement by Classic to re-convey to Claxton, III for the undertaking of responsibility for certain liens granted by him does not satisfy that test.
Accordingly, the motion of defendant Williams to submit newly-discovered evidence, or in the alternative to supplement the record, will be denied.
An appropriate Order will enter.
NOTES
[1] Richard A. Bartl, who was receiver for Claxton, III at the inception of this complaint, is now Trustee in Bankruptcy of the estate of Claxton, III. See footnote 3, infra.
[2] The bankruptcy petition against Claxton, III was filed prior to the October 1, 1979 effective date of the Bankruptcy Code, the current Title 11 of the United States Code. Accordingly, this case continues to be governed by the former Bankruptcy Act of 1898. (Act of November 6, 1978, P.L. 95-598, Title IV § 403(a), 92 Stat. 2683.)
[3] This follows even when adjudication occurs much later. Once the order of adjudication is entered and a trustee appointed, the trustee's title "relates back" to the date of filing. (In re Lustron Corp., 184 F.2d 798 (7th Cir.1950); In re Diamond's Estate, 259 F. 70 (6th Cir.1919).) In the instant case, Claxton, III was the subject of an involuntary petition filed June 26, 1979. An order of adjudication was entered March 21, 1980. Claxton, III moved to vacate the order and, following further hearings, the Court denied the motion on March 8, 1982. Richard A. Bartl, Claxton, III's receiver, was appointed trustee at the first meeting of creditors held April 12, 1982. The trustee's title to the bankrupt's property however, dates from June 26, 1979. A receiver exercises the same rights during the pendency of adjudication proceedings. (Bankruptcy Act § 69; Rule 201 Rules of Bankruptcy Procedure.)
[4] Section 70e confers on the Trustee in Bankruptcy similar power to avoid any transfers which are fraudulent under applicable state law. (Bankruptcy Act Section 70e.)
[5] The Supreme Court in the case of Cline v. Kaplan, 323 U.S. 97, 65 S.Ct. 155, 89 L.Ed. 97 (1944), cited by the defendant, sustained a defendant's objection to jurisdiction based on the defendant's allegation that the bankrupt did not own the property. However, this case was later overruled by Congress with the enactment in 1952 of Section 2a(7).
[6] Collier on Bankruptcy states that "subject matter jurisdiction in a bankruptcy setting, essentially goes only to the original issue as to whether the bankrupt is a proper party who may utilize the benefits of the Bankruptcy Act or who may be proceeded against as an involuntary bankrupt". (13 Collier on Bankruptcy (14th ed.), ¶ 712.05[2] at 7-179.) Therefore, once the case has been filed and is pending, disputes and proceedings "arising within that case do not raise the strict issue of subject matter jurisdiction." (Id.)
[7] Both Ms. Williams and an officer of Union First National Bank of Washington testified that beginning in October 1979, and continuing thereafter, Williams had attempted to substitute her own note and deed of trust to the property for two secured notes already held by the bank. Williams also attempted to assume a sixth deed of trust held by the bank. The bank would agree, however, only if Williams could obtain title insurance. A suit to quiet title brought by Classic Homes and still pending at the time of trial apparently prevented Williams from meeting the bank's terms. See page 210 infra.
[8] Virginia Code § 55-80 reads as follows:

Every gift, conveyance, assignment or transfer of, or charge upon, any estate, real or personal, every suit commenced or decree, judgment or execution suffered or obtained and every bond or other writing given with intent to delay, hinder or defraud creditors, purchasers or other persons of or from what they are or may be lawfully entitled to shall, as to such creditors, purchasers or other persons, their representatives or assigns, be void. This section shall not affect the title of a purchaser for valuable consideration, unless it appear that he had notice of the fraudulent intent of his immediate grantor or of the fraud rendering void the title of such grantor.
(Va.Code § 55-80 (1981 Repl. vol.).)
[9] Section 70d(5) of the Bankruptcy Act states, in pertinent part: "A person asserting the validity of a transfer under this subdivision shall have the burden of proof." (Bankruptcy Act § 70d(5).)