### In re AMA CORPORATION, Debtor.

### Bankruptcy No. 5–94–00677.

United States Bankruptcy Court,
W.D. Virginia,
Harrisonburg Division.

Jan. 4, 1995.

Douglas E. Little, Charlottesville, VA, for debtor.

Mark B. Callahan, Harrisonburg, VA, for Crestar Bank.

## DECISION AND ORDER

ROSS W. KRUMM, Chief Judge.

Hearings were held on October 26, 27, and 28, 1994, on the motion of Crestar Bank (herein Crestar) to dismiss the Chapter 11 case of AMA Corporation (herein the Corporation) on the ground that the case was filed in bad faith. The Court has heard testimony, judged the credibility and demeanor of witnesses, and considered authority provided by the parties. For the reasons stated herein, the Court finds that the motion should be granted and the Chapter 11 case of AMA shall be dismissed.

## FACTS

**Background—Prepetition**

The Augusta Military Academy was, for many years, a private secondary military education institution located in Augusta County, Virginia. In 1984, however, it ceased operations and the physical plant has been unoccupied and little maintained ever since. In 1986, the real property was purchased by the AMA Land Trust (herein the Trust) at a foreclosure sale. At that time, a credit line deed of trust in the amount of $465,000.00 was executed in favor of United Virginia Bank, and was secured by the main parcel of real property, 19.62 acres known as the "campus tract." Plaintiff's Exhibit B. In the years from 1986 to 1994, the Trust was administered by its two trustees: D. Cecil Culbertson and John W. Sharman. In a 1992 refinancing, a note was executed in favor of Crestar Bank in the amount of $317,077.83 (herein the Crestar Note). Plaintiff's Exhibit A. This note was secured by the 1986 credit line deed of trust, by four (4) promissory notes payable to Cecil and Nancy Culbertson (herein the Culbertsons' notes), and by the Culbertsons' personal guaranty. The Crestar Note is the only secured obligation of the Trust.

By 1993, the Trust was in default on its obligation under the Crestar Note. Crestar began foreclosure on the property with a letter dated June 28, 1993, stating that the Crestar Note was in default and demanding immediate payment. Plaintiff's Exhibit C. The foreclosure did not proceed far, however, as Crestar, the Trust, and the Culbertsons entered into an extension agreement (herein the first extension agreement) that allowed the Trust additional time to pay its obligation to Crestar. Defendant's Exhibit 1. Under the first extension agreement, the Trust had until July 1, 1994, to obtain financing to satisfy its entire debt to Crestar. *Id.* at ¶ 5. At the expiration of that period, a balloon payment was due on the remaining balance. *Id.* As consideration for the extension, $175,000.00 was to be paid over to Crestar by July 9, 1993, to satisfy overdue interest payments, real estate taxes, an insurance premium, and to reduce the principal balance owed. *Id.* at ¶ 1. As part of the agreement, the Trust was to make monthly interest payments and to reimburse Crestar for future insurance premiums as they came due. *Id.* at ¶¶ 3 and 4. In exchange, Crestar was to return the Culbertsons' notes held as collateral, and to forbear from pursuing its remedies under state law until the expiration of the agreement's term. *Id.* at ¶ 2. The first extension agreement was not performed by the Trust and the $175,000.00 was not paid when due.[1]

On July 26, 1993, Crestar again notified the trustees of the Trust that it would proceed to foreclose on the note and liquidate its collateral pursuant to the terms of the deed

---

1. In his direct testimony, Doyle C. Culbertson Jr. (herein Mr. Culbertson) stated that Crestar failed to honor its obligations under the first extension agreement and shortened the time allowed for the Trust to refinance. However, this explanation does not comport with the facts. In reality, the Trust failed to pay over the $175,000.00, due on July 9, 1993, under the agreement. This failure was followed not by Crestar's unwarranted refusal to perform, but rather by its continued willingness to extend credit despite ongoing defaults.

of trust. Plaintiff's Exhibit E. Also, Augusta County sought judgment for unpaid real estate taxes for the years 1988 through 1992. When finally paid by Crestar on September 28, 1993, these taxes totalled $44,130.82.

A foreclosure sale was averted again when the parties renewed workout negotiations. On September 22, 1993, Crestar and the Trust entered into a new extension agreement (herein the second extension agreement). Plaintiff's Exhibit R. The terms of the second extension agreement were essentially the same, except that the $175,000.00 was paid the day the agreement was signed and the extension lasted only until April 1, 1994. After the expiration of the agreement, the remaining balance was to be paid in full with a single balloon payment. *Id.* at ¶ 5. Unlike the first extension agreement, the second was initially performed. Doyle C. Culbertson Jr.[2] (herein Mr. Culbertson) liquidated notes held by the La Grange Farm Trust, a land trust of which he is the primary beneficiary, to raise the $175,000.00 required to be paid over by the terms of the second extension agreement. On the day the agreement was executed, September 22, 1993, $175,000.00 was paid to Crestar and the Culbertsons' notes were returned to them. As a result, the Trust's indebtedness was reduced from $328,965.40 ($317,077.83 in remaining principal, plus accrued interest and late charges) to approximately $195,000.00. Plaintiff's Exhibit K.

After initially performing the second extension agreement in September 1993, neither the Culbertson's nor the Trust were successful in putting together a business plan or the requisite financing to complete the extension agreement. Also, the insurance premiums, taxes, and interest which were to be paid by the Trust under the second extension agreement were not paid.[3] On May 9, 1994, Crestar wrote the Culbertsons to notify them of its intent to initiate foreclosure proceedings for the third time. *See* Motion to Dismiss, ¶ 17. This notice precipitated another round of efforts to delay or postpone the foreclosure. This time the parties did not come to an agreement and a sale was scheduled by Crestar for September 28, 1994.[4]

Faced with foreclosure, the Culbertsons took drastic action. Without notice to, or the consent of, Crestar, the Trust conveyed all of its real property to the Corporation on September 27, 1994. As part of the conveyance, the Corporation purported to assume the indebtedness to Crestar. At trial, Mr. Culbertson testified that the only asset of the Corporation, other than the AMA property, is a truck having a value of approximately $5,000.00.

Immediately after the deed of conveyance was recorded, the Corporation filed a Chapter 11 proceeding in this Court, thereby invoking the automatic stay provisions of 11 U.S.C. § 362. Crestar was notified of the filing and responded by filing the motions for relief and dismissal now before the Court for decision. In addition, Crestar appeared at the sale site, informed the bidders who appeared of the filing, and proceeded to have the auctioneer cry the sale with the proviso that all bids were subject to the bankruptcy filing and subsequent court rulings.

## LAW

### Bad Faith Filing

■ In the Fourth Circuit, *Carolin Corp. v. Miller* holds that the filing of a Chapter 11 petition must be in good faith or dismissal is in order. 886 F.2d 693 (4th Cir.1989). This is derived from 11 U.S.C. § 1112(b), which allows a court to dismiss a Chapter 11 case for cause. Section 1112(b) includes a list of examples that constitute cause warranting dismissal, including the following:

---

2. Doyle C. Culbertson Jr. is the son of D. Cecil and Nancy Culbertson.

3. As of October 28, 1994, insurance premiums are accruing at the rate of $443.17 per month, and interest is accruing at a rate of $1,465.63 per month (calculated at the prime rate plus one (1) percent, as of October 28, 1994).

4. Crestar noticed the Trustees of the Trust on August 30, 1994, advertised in the Daily News Leader, and employed an auctioneer who did additional advertising.

1. Continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;

2. Inability to effectuate a plan; and

3. Unreasonable delay by the debtor that is prejudicial to creditors.

11 U.S.C. § 1112(b)(1)–(b)(3). From these subsections, the Fourth Circuit concluded in *Carolin* that there is a generalized good faith filing requirement in Chapter 11. *Carolin,* 886 F.2d at 698–99.

■ *Carolin* sets out a two-pronged test to determine whether or not a Chapter 11 filing is in bad faith. This test is applied as a "totality of the circumstances" inquiry that seeks to determine whether the purposes of the Bankruptcy Code would be furthered by permitting the Chapter 11 petitioner to proceed past the petition. *Id.* at 701.

The first prong of the test looks to the extent that the case is objectively futile. This inquiry is designed to insure that there is embodied in the petition "some relation to the statutory objective of resuscitating a financially troubled [debtor]." *Id.* (*quoting In re Coastal Cable T.V., Inc.,* 709 F.2d 762, 765 (1st Cir.1983)). A key factor in assessing objective futility is whether "there is no going concern to preserve, there are no employees to protect, and there is no hope of rehabilitation, except according to the debtor's 'terminal euphoria.'" *Id.* at 701–02 (*quoting In re Little Creek Development Co.,* 779 F.2d 1068, 1073 (5th Cir.1986)).

The second prong of the test looks to the extent that the Debtor filed the case in subjective bad faith. This inquiry is designed to insure that the petitioner actually intends "to use the provisions of Chapter 11 ... to reorganize or rehabilitate an existing enterprise, or to preserve going concern values of a viable or existing business." *Id.* at 702 (*quoting In re Victory Constr. Co.,* 9 B.R. 549, 564 (Bankr.C.D.Cal.1981)). The aim of the subjective inquiry is to determine whether the petitioner's real motivation is "to abuse the reorganization process" and "to cause hardship or to delay creditors by resort to the Chapter 11 device merely for the purpose of invoking the automatic stay, without an intent or ability to reorganize his financial activities." *Id.* (*quoting In re Thir-*

*tieth Place, Inc.,* 30 B.R. 503, 505 (9th Cir. BAP 1983)).

The court in *Carolin* placed great emphasis on the reasoning behind the decision in *In re Thirtieth Place, Inc.* There, the debtor, owning only a single asset, filed bankruptcy after a predecessor corporation had already filed a bankruptcy petition and then conveyed its property to the debtor. Both conveyances took place immediately before scheduled foreclosure sales. The court considered a number of factors to determine if the filing was in bad faith. These include the following:

1. Corporation created for the sole purpose of filing the bankruptcy petition;

2. Single asset case;

3. Conveyance necessary to allow the Chapter 11 filing;

4. Gain in managerial expertise by the conveyance;

5. History of past business conduct;

6. Number of employees;

7. Existence of business activity at the time of filing; and

8. Reasonable prospect for future business conduct.

*In re Thirtieth Place,* 30 B.R. 503, 505 (9th Cir. BAP 1983).

*Carolin* also relied on *Matter of Little Creek Development Co.,* in which the Fifth Circuit set forth the following factors:

1. A single secured creditor's lien encumbers the single asset;

2. No cash flow;

3. No available sources of income to sustain a plan of reorganization or adequate protection payments;

4. Few, if any, unsecured creditors, all of whose claims are very small;

5. Secured creditor has proceeded to foreclosure because of arrearages and debtor has been unable to stop the sale in state court;

6. Chapter 11 is the only way debtor can avoid the sale; and

7. "The New Debtor Syndrome," in which a single asset entity has been created or revitalized on the eve of foreclosure

to isolate the insolvent property and its creditors.

*Matter of Little Creek Development Co.,* 779 F.2d 1068, 1073 (5th Cir.1986).

Moreover, the court in *In re Thirtieth Place* stated that bad faith exists if "it is obvious that a debtor is attempting unreasonably to deter and harass creditors in their bona fide efforts to realize upon their securities...." *Thirtieth Place,* 30 B.R. at 505 (*quoting Matter of Levinsky,* 23 B.R. 210, 218 (Bankr.E.D.N.Y.1982)).

*Carolin* has been applied in the Western District of Virginia in *RTC v. C & R, L.C.,* 165 B.R. 593 (W.D.Va.1994). In the *C & R* case, two pieces of property, one of which was encumbered by a note and lien in favor of the RTC, were owned by a corporation. Under the terms of the note, the stockholders had agreed not to take any action that would cause the corporate owner to merge with another company, or to sell or encumber its assets. Payments on the note were not current and the RTC, using state law foreclosure channels, had set a sale for January 28, 1993. A Federal District Court had entered a final order permitting the RTC to foreclose, appointing a receiver, and forbidding the owners from interfering in any way. However, on January 26, 1993, the properties were conveyed first to a holding company, and then to C & R, L.C., a Virginia limited liability company that was formed on January 6, 1993. On these facts, the Bankruptcy Court held that a bad faith filing had not been shown and denied the RTC's motion to dismiss. The District Court reversed, holding that it was clearly erroneous not to have found a bad faith filing in light of *Carolin.* Among other things, the court placed great weight on the fact that the Debtor's only assets were the two properties, the conveyance was in contravention of the collateral agreement and the District Court's ruling, and the conveyance was fraudulent under state law. *C & R,* 165 B.R. at 594–95.

Section 55–80 of the Code of Virginia defines a fraudulent conveyance as follows:

Every ... conveyance ... [upon] any estate, real or personal, ... with intent to delay, hinder or defraud creditors ... shall ... be void.

Va.Code Ann. § 55–80 (Michie 1950). To fall within the scope of this section, the transfer must be done with intent to delay, hinder, or defraud. Because of the difficulty of establishing "actual intent," evidence of fraud may, and generally must, be circumstantial. Consequently, courts have relied historically upon presumptions of fraud, known as "badges of fraud," which consist of facts and circumstances that the law admits to be the signs of fraud. From the existence of these, fraudulent intent may legitimately be inferred. *Hyman v. Porter (In re Porter),* 37 B.R. 56, 63 (Bankr.E.D.Va.1984). These are, among others, (1) the close relationship of the parties, (2) the grantor's insolvency, (3) pursuit of the grantor by creditors at the time of the transfer, (4) inadequate consideration, and (5) retention of possession of the property by the grantor. *Bartl v. Garfinkel (In re Claxton),* 30 B.R. 199, 212 (Bankr. E.D.Va.1983).

## DISCUSSION

### Objective Futility

■ There are eight facts that weigh heavily in favor of finding that the success of AMA Corporation's Chapter 11 petition is objectively futile. These are as follows:

1. The Augusta Military Academy closed in 1984, and no business or school of any sort has operated there since.

2. Since the time that the AMA Trust acquired its interest in the former Augusta Military Academy, no measurable amount of income or activity has occurred on the premises.[5]

3. Since the time that the AMA Trust acquired its interest in the former Augusta Military Academy, the buildings have not been properly maintained and have fallen into a severe state of disrepair. The testimony at trial was at best inconclusive as to whether or not the condition of the AMA properties was good enough to allow for some hope of repair at a reasonable cost. At

---

**5.** Mr. Culbertson testified that, to his knowledge, during this time period only one event was held

for which the Trust was able to receive any income.

worst, the evidence was clear that the facilities are in very poor condition and will require extensive repair to become usable.

4. Despite the extension agreements entered into with Crestar, no willing commercial lenders were, or likely can be, located in a commercially reasonable period of time to extend credit to the AMA Corporation to open another military academy. The evidence at trial shows that Mr. Culbertson had a considerable period of time to form a business plan, obtain support for it, and make significant inroads to a financing commitment. The evidence also shows that his efforts were totally unsuccessful.

5. No one was disclosed at trial who has any experience in the fields of either business or secondary education, who will be involved with a revitalized AMA. Neither Doyle C. Culbertson Jr., nor his father, D. Cecil Culbertson, are educators or business people. According to his own testimony, Doyle C. Culbertson Jr.'s only business education is "a few" college-level accounting classes.

6. Despite discussions between Augusta Military Academy alumni and the AMA Corporation, no commitment of support to a reopened school has been given. It appears that the only party with an active interest in revitalization of the school is Mr. Culbertson.

7. Despite the year spent on its compilation, the business plan that Mr. Culbertson finally created is inadequate for presentation to potential lenders.

8. Neither AMA Trust nor AMA Corporation have been able to fund their obligations to Crestar Bank for interest, insurance, or property taxes without liquidating significant personal assets. There is no substantive proof that the Corporation has any real prospect of making adequate protection payments to Crestar.

These facts show a continuing loss to or diminution of the estate, especially given the onset of winter. The length of time it took Mr. Culbertson to produce a business plan, which is still incomplete, and the lack of any concrete proposal for reorganization after over a year of opportunity prepetition indicate that it is more likely than not that the Debtor will be unable to effectuate a plan. Finally, it is clear that, prepetition, Crestar gave every opportunity for a resolution of the financial distress of the property and that during this time the property continued to deteriorate. Any further delay will be prejudicial to Crestar. There is no going concern to preserve and no hope of rehabilitation except the hope that springs eternal from the Debtor. Objective futility has been proven.

### Subjective Bad Faith

Based on the evidence, the indicia of subjective bad faith in this case are as follows:

1. There is a single asset secured by Crestar's lien.

2. The Debtor has no cash flow.

3. The Debtor has no available source of income to sustain a plan of reorganization or adequate protection payments.

4. Crestar had scheduled a foreclosure sale. On the eve of the sale, the real property was transferred from a real estate trust to a corporation because the real estate trust is not eligible for relief under the Bankruptcy Code.[6]

5. Virginia Code section 51–80 allows the avoidance of a property conveyance when it is made with the intent to delay, hinder, or defraud creditors. *See supra* p. 898. Fraudulent intent can be established by showing the existence of some or all of the badges of fraud listed above. Four badges of fraud are present in the facts surrounding the conveyance of the AMA Trust property to the AMA Corporation.

---

**6.** 11 U.S.C. § 109(a) states that "only a person ... may be a debtor under" Title 11. 11 U.S.C. § 101(41) defines "person" to "include[ ] individual, partnership, and corporation...." The legislative history of section 101(41) states as follows:

  Person includes individual, partnership and corporation ... *The definition does not include*

*an estate or a trust,* which are included only in the definition of "entity." H.R.Rep. No. 595, 95th Cong., 1st Sess. 313 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 25 (1978). (emphasis added)

Section 109 does not allow an "entity" to be a debtor.

a. The parties to the conveyance are related. D. Cecil Culbertson is the Trustee of AMA Trust. Doyle C. Culbertson Jr. is the sole owner of AMA Corporation, as well as its president, secretary, and a director. *See* Chapter 11 Petition of AMA Corporation. As well, D. Cecil Culbertson is AMA Corporation's vice president, secretary, and a director.

b. AMA Trust could not pay its debts at the time of the conveyance.

c. The Trust was actively being pursued by its creditors at the time of the conveyance, as it took place on the eve of the scheduled foreclosure sale.

d. The conveyance was for inadequate consideration. According to Debtor's schedule A, the value of the corporation is $1,500,000.00. Yet, according to a settlement statement purporting to evidence the transaction, the consideration paid was $539,600.00.[7]

*See* Defendant's Exhibit 2. Taking this figure on its face, and construing the evidence in a light most favorable to the Debtor, the consideration is inadequate. In reality there was no consideration paid. Instead, legal entities were substituted in order to obtain the protection of the Bankruptcy Code.

6. The assumption of the Crestar debt violated the terms of the Note and deed of trust. The Crestar Note states that "the sale or transfer by a Party of all or substantially all of such Party's assets other than in the ordinary course of business" shall constitute a default. Plaintiff's Exhibit A, "Default, Acceleration and Setoff," no. 10. The credit line deed of trust that was executed in 1986 states as follows:

3. In the event of any sale, conveyance, transfer or assignment of the Property or any other change of ownership of the Property, other than by the law of inheritance or by testamentary devise, without the written consent of the Bank, the entire unpaid balance of the Secured Indebtedness and all other sums secured hereunder shall become due and payable....

Plaintiff's Exhibit B, ¶ 3. Therefore, the conveyance was a default under both the Crestar Note and the credit line deed of trust.

This Court concludes that it is clear that the Debtor is attempting to deter Crestar in its efforts to realize on its collateral by use of the automatic stay without any realistic ability to reorganize the non-existent financial activities of the former Augusta Military Academy. Subjective bad faith exists in this case.

## CONCLUSION

Crestar has proven both the objective futility and subjective bad faith prongs of the *Carolin* test for a bad faith filing. Accordingly, it is

## ORDERED:

That Crestar Bank's motion to dismiss the Chapter 11 case of AMA Corporation on the basis of bad faith filing is GRANTED, and case number 5-94-00677 of AMA Corporation is DISMISSED.

---

7. Using the word "paid" is a misnomer. In fact, no money actually changed hands when the conveyance was executed. The amount is derived primarily from the following:

1. $210,000.00 for AMA Corporation's assumption of the debt to Crestar under the note and credit line deed of trust;
2. $256,000.00 for debts owed by the Trust to LaGrange Farm Trust. According to Doyle C. Culbertson Jr.'s testimony, LaGrange Farm Trust held all of his personal net worth. By liquidating some notes in

favor of that trust, Mr. Culbertson was able to raise the $175,000.00 consideration paid to Crestar under the second extension agreement. The amount listed as "paid" is higher than $175,000.00 because the notes had to be liquidated at a discount of $81,-000.00 to raise the funds quickly. Mr. Culbertson charges this discount to the Corporation as a debt owing to him personally.
3. $71,500.00 for assumption of "disputed judgments which may attach to the property."